No. 95-194

IN THE SUPREME COURT OF THE STATE OF MONTANA

1996

STATE OF MONTANA,

    Plaintiff and Respondent,

v.

MARY-HELEN COLLIER,

    Defendant and Appellant.

FILED

JUN 20 1996

CLERK OF THE SUPREME COURT
STATE OF MONTANA

APPEAL FROM:    District Court of the Eighth Judicial District,
In and for the County of Cascade,
The Honorable Robert P. Goff, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

    John Keith, Great Falls, Montana

    For Respondent:

    Joseph P. Mazurek, Attorney General, Barbara Harris,
Assistant Attorney General, Helena, Montana; Brant
Light, Cascade County Attorney, Great Falls, Montana

Submitted on Briefs:  January 18, 1996

Decided:  June 20, 1996

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

Mary-Helen Collier was charged by information in the Eighth Judicial District Court, Cascade County, with solicitation of deliberate homicide. Pursuant to a plea agreement, Collier pleaded guilty to an amended charge of criminal endangerment. She was sentenced to eight years in the Women's Correctional Facility and designated a dangerous offender for purposes of parole eligibility. Collier appeals her sentence and the District Court's order denying her Motion to Dismiss for Lack of a Speedy Trial. We affirm.

Collier raises the following issues on appeal:

1. Did the District Court err in failing to dismiss the matter for lack of a speedy trial?

2. Did the District Court err in designating Collier a dangerous offender?

3. Did the District Court err in failing to find that Collier was unable to appreciate the criminality of her conduct?

4. Did the District Court err in ordering Collier to pay restitution?

5. Did the District Court err in permitting the County Attorney to argue facts at sentencing supporting the original charge of solicitation of deliberate homicide?

6. Did the District Court err in failing to release Collier or transfer her to a different detention facility due to conditions at the Cascade County jail?

Factual and Procedural Background

On September 27, 1993, Bridget Fackrell reported to the Great

2

Falls Police Department that Collier had attempted to hire Fackrell and another individual to kill Collier's ex-husband, Evan Danno. Fackrell claimed that several months earlier, while she and Collier roomed together, Collier repeatedly stated that she wished to have Danno killed so that she could be rid of him.

In early September, prior to her report to the police, Fackrell travelled to Idaho to attend a funeral. She returned to Great Falls with two friends, Travis Moreland and Carlton Taylor. When Fackrell told Moreland and Taylor of Collier's desire to have Danno killed, Moreland suggested that they agree to do the job, take Collier's money, then warn Danno of Collier's plan.

Fackrell arranged a meeting between Collier, Moreland and Taylor wherein the parties agreed that Moreland would kill Danno as soon as Collier could arrange to be out of town with the children. Collier had recently moved back into Danno's home where she was residing with Danno and their two daughters. The plan called for Moreland to enter Danno's home early one morning while Collier and the children were away, kill Danno and make it look as though there had been a burglary. Collier agreed to pay Moreland $1500 to kill Danno.

A few days after the meeting, Collier informed Fackrell that she would be attending her uncle's funeral in Kalispell and that she wanted Danno killed while she and the children were gone. Prior to leaving town, Collier gave Fackrell a key to Danno's house, a personal check for $250, Collier's instant cash card, the security code to allow access to her account and instructions to

3

withdraw $500 from the account. Collier had previously given Moreland a picture of Danno. Fackrell turned all of these items over to the authorities when she informed them of Collier's plan.

Collier was arrested in Kalispell on September 30, 1993. She was transferred to the Cascade County jail the following day and charged with solicitation of deliberate homicide, a felony, as specified in §§ 45-4-101 and 45-5-102(1)(a), MCA (1991). Her bail was set at $250,000.

The District Court determined that Collier was indigent and appointed Billy Miller, an attorney under contract to the Cascade County Public Defender's Office, to represent her. At her October 19, 1993 arraignment, Collier entered a plea of not guilty and the first of several trial dates was set. Over the next few months, several motions for reduction of bail were filed but each was denied by the District Court. Collier was unable to post bail and she remained in the Cascade County jail from October 1, 1993, until after her sentencing on January 13, 1995.

On December 6, 1993, Miller filed a motion in District Court to vacate and reset the trial date to allow him additional time to prepare Collier's defense. The District Court granted the motion and a second trial date was set. On December 14, 1993, Miller requested that the public defender's office appoint new counsel for Collier as Miller intended to leave his public defender position at the end of the year. The court appointed Marvin Anderson, also under contract to the public defender's office, to represent Collier.

4

Anderson filed a motion on February 8, 1994, requesting a psychiatric evaluation for Collier. However, in a handwritten letter addressed to the District Court Judge, Collier objected to a transfer to Montana State Hospital at Warm Springs for the evaluation. Anderson withdrew the motion a few days later. The District Court Judge received another handwritten letter from Collier on April 12, 1994, in which she complained of inadequate representation by counsel and requested that her trial be delayed.

On April 22, 1994, Anderson filed a motion for a psychiatric evaluation of Collier to be performed in Great Falls. The District Court granted the motion the same day. However, a few days later, Collier agreed instead to undergo a psychiatric evaluation at Montana State Hospital at Warm Springs.

Collier and nine other individuals filed a petition in federal district court to intervene in an action regarding the public defender system in Cascade County. On April 25, 1994, Anderson filed a motion with the court to continue the trial due to a scheduling conflict with Collier's civil case. The District Court granted Anderson's motion and the trial date was again reset.

On May 16, 1994, the chief public defender in Cascade County filed a motion to withdraw the public defender's office from representation of Collier and the nine other individuals who had petitioned the federal court for intervention. Two days later, an attorney independent of the public defender's office was appointed to represent Collier and trial was reset by order of the court. The County Attorney filed a motion on June 17, 1994, to reschedule

5

the trial as the scheduled date fell on a Thursday. This motion was granted and trial was subsequently rescheduled.

Collier's attorney filed several motions on June 29, 1994, including a motion to dismiss the charge for lack of a speedy trial and a motion to release or transfer Collier from the Cascade County jail as the jail did not meet state standards. In addition a motion was filed on August 10, 1994, for authorization to hire an investigator and a psychologist. On September 21, 1994, the District Court, without a hearing, authorized Collier's counsel to incur up to $2000 in professional and investigative services.

The District Court scheduled a hearing for August 5, 1994, on the motion to dismiss for lack of a speedy trial and the motion to release or transfer Collier. This hearing was postponed until October 7, 1994. After hearing testimony, the District Court denied both motions.

Collier's attorney filed a motion on October 3, 1994, to transport Collier to Missoula for another psychiatric evaluation. The court granted the motion the same day.

On October 20, 1994, the State requested a continuance and the trial date was once again reset. At some time prior to this new trial date of December 12, 1994, the parties reached an agreement wherein the original charge of solicitation of deliberate homicide was amended to a charge of criminal endangerment, a felony, pursuant to § 45-5-207, MCA (1993). In the Acknowledgement of Waiver of Rights accompanying the plea agreement, Collier waived her right to plead not guilty and her right to be tried by a judge

6

or a jury.

Collier entered a plea of guilty to the charge of criminal endangerment on December 9, 1994. She was sentenced on January 13, 1995, to eight years in prison and designated a dangerous offender for purposes of parole eligibility. In its sentencing order, the District Court recommended that if Collier is released on parole or supervised release before the completion of her full sentence, then such parole or supervised release should be subject to several conditions including payment of restitution and a supervision fee.

## Issue 1.

Did the District Court err in failing to dismiss the matter for lack of a speedy trial?

Collier was arrested on September 30, 1993, and arraigned on October 19, 1993. After several continuances, a trial date of December 12, 1994, was set. But, a few days prior to trial, Collier entered into a plea agreement wherein she agreed to plead guilty to an amended charge of criminal endangerment. From the date of her arrest until after sentencing, Collier remained in custody at the Cascade County jail.

On June 29, 1994, after being in custody for more than 270 days, Collier filed a Motion to Dismiss for Lack of a Speedy Trial. In denying her motion, the District Court determined that most of the delay was attributable to Collier. Collier contends that this was error and that the State caused the majority of the delay.

The State, on the other hand, contends that Collier waived her right to raise the issue on appeal when she pleaded guilty. The

State further contends that even if she did not waive her right to raise the issue on appeal, her right to a speedy trial was not violated.

This Court has previously stated that a plea of guilty that is voluntarily and understandingly made constitutes a waiver of nonjurisdictional defects and defenses, including claims of constitutional violations which occurred prior to the plea. Hagan v. State (1994), 265 Mont. 31, 35, 873 P.2d 1385, 1387 (citing State v. Turcotte (1974), 164 Mont. 426, 428, 524 P.2d 787, 788). The right to a speedy trial is a nonjurisdictional defect claim. U.S. v. Bohn (9th Cir. 1992), 956 F.2d 208, 209.

However, we find that in this case Collier did not waive her right to a speedy trial. On the contrary, the language in the plea agreement shows that Collier did reserve her right to appeal:

> Each party understands that the presiding District Court Judge can designate the defendant as a dangerous offender as well as limit his eligibility for parole and work release furlough programs, and that the defendant gives up certain rights as outlined in the accompanying waiver of rights, *but the defendant may subsequently appeal any improper determination or ruling by the Court.* [Emphasis added.]

Moreover, both the County Attorney and Collier signed the plea agreement. Thus we conclude that Collier did reserve her right to appeal the District Court's order denying her Motion to Dismiss for Lack of a Speedy Trial. We next address the merits of her claim.

The Sixth Amendment to the United States Constitution and Article II, section 24, of the Montana Constitution guarantee a criminal defendant's right to a speedy trial. Whether that right has been violated is determined by a four-part test set out in

8

Barker v. Wingo (1972), 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101, 116-17, and adopted by this Court in State ex rel. Briceno v. Dist. Ct. of 13th Jud. Dist. (1977), 173 Mont. 516, 518, 568 P.2d 162, 163-64.

This test requires a balancing of the following four factors: (1) the length of the delay; (2) the reason for the delay; (3) the assertion of the right by the defendant; and (4) prejudice to the defendant. State v. Matthews (1995), 271 Mont. 24, 27-28, 894 P.2d 285, 287 (citing State v. Stewart (1994), 266 Mont. 525, 529, 881 P.2d 629, 632). No one factor is determinative, rather, all four factors are weighed by considering the facts and circumstances of each case. Matthews, 894 P.2d at 287.

The first factor, length of the delay, triggers further inquiry into the remaining three factors. It is not necessary to consider the remaining factors unless the length of the delay is presumptively prejudicial. State v. Eklund (1994), 264 Mont. 420, 424, 872 P.2d 323, 326 (citing State v. Thompson (1993), 263 Mont. 17, 32, 865 P.2d 1125, 1134). When considering the length of the delay, no regard is given to which party caused the delay. Eklund, 872 P.2d at 326.

In the case before us, there had already been a delay of more than 270 days by the time Collier brought her Motion to Dismiss for Lack of a Speedy Trial. We have previously stated that a delay of over 200 days will usually trigger further analysis. Eklund, 872 P.2d at 326; Matthews, 894 P.2d at 287. Thus the delay in the present case is more than sufficient to warrant an analysis of the

9

remaining three factors.

We have already established that Collier met the third factor of the test, assertion of the right by the defendant, when she filed her Motion to Dismiss for Lack of a Speedy Trial in a timely manner. In analyzing the two remaining factors, we must keep in mind that the State has the burden to provide a reasonable explanation for the delay and to show that the defendant was not prejudiced by the delay. Eklund, 872 P.2d at 326.

The second factor, reason for the delay, requires us to allocate portions of the overall delay to the party responsible for causing that particular delay. Here, Collier argues that the District Court was incorrect in allocating the majority of the delay to her. She contends that Cascade County, by its undertaking to provide representation, should bear the full burden of the consequences of failing to appoint counsel with sufficient experience and capability to provide representation to a defendant.

While we agree that the first 75 days of the delay, from the time Collier was arrested until the original date set for trial, represented institutional delay properly allocated to the State, we conclude that the balance of the time, with some minor exceptions, was properly allocated to Collier. Moreover, institutional delay, though charged against the State, weighs less heavily than intentional delay. State v. Gould (1995), 273 Mont. 207, 216, 902 P.2d 532, 538.

On December 6, 1993, one week prior to the original date set for trial, Collier's attorney filed a motion to vacate and reset

10

the trial date to allow him additional time to prepare Collier's defense. The District Court rescheduled the trial for February 8, 1994. Thus the 56 day delay from December 14, 1993, to February 8, 1994, is attributable to Collier.

On February 8, 1994, Collier's attorney filed a motion for a bail reduction hearing and a motion for a psychiatric evaluation of Collier. Due to these pending motions, the District Court rescheduled the trial for March 21, 1994. Hence, the 41 day delay from February 8, 1994, to March 21, 1994, is attributable to Collier as well.

There is no information in the record as to why the trial was not held on March 21, 1994. However, on March 31, 1994, the State requested that a trial date be set and the court set April 25, 1994, as the new trial date. Since the 35 day delay from March 21, 1994, to April 25, 1994, is of unknown origin, for purposes of this discussion, we will attribute that time to the State as institutional delay.

On April 12, 1994, the District Court Judge received a handwritten letter from Collier requesting that the April 25, 1994 trial date be reset due to lack of adequate counsel and a conflict with her civil case. Collier's attorney filed a motion on April 22, 1994, to commit Collier to Montana Deaconess Medical Center in Great Falls for a mental health examination. In addition, he filed a motion on April 25, 1994, to continue the trial due to conflicts with Collier's civil case. The District Court rescheduled the trial for June 7, 1994. Consequently, the 43 day delay from April

11

25, 1994, to June 7, 1994, is also attributable to Collier.

On May 16, 1994, the public defender's office withdrew from representation of Collier and on May 18, 1994, new counsel was appointed. On June 7, 1994, the District Court issued an order vacating the trial set for that date due to a conflict in the court's calendar and resetting the trial for July 7, 1994. The 30 day delay from June 7, 1994, to July 7, 1994, is institutional delay attributable to the State.

Collier filed her Motion to Dismiss for Lack of a Speedy Trial on June 29, 1994. Of the nearly 280 days from the date of her arrest on September 30, 1993, until her motion to dismiss was filed on June 29, 1994, 140 days can be considered institutional delay attributable to the State, and 140 days are directly attributable to Collier.

While Collier contends that the majority of the delay attributed to her is due to the inexperience of her appointed public defenders, she fails to establish what exactly her public defenders failed to do on her behalf, how they failed to represent her interests or how their requests for additional time to prepare her defense, for bail reduction and for psychiatric evaluation could be or should be attributed to the State. Collier's conclusory statements of inadequate representation by her public defenders are unpersuasive in the face of the record which demonstrates that both she and her public defenders were actively involved in her defense.

Furthermore, even if we accept, arguendo, Collier's argument

12

that the majority of the delay should be attributed to the State, she has, nevertheless, failed to demonstrate how that delay prejudiced her defense in any way. Prejudice to the defendant, the fourth factor of the Barker test, is analyzed by assessing three interests which the right to a speedy trial was designed to protect: (1) prevention of oppressive pretrial incarceration; (2) minimization of the defendant's anxiety and concern; and (3) avoidance of impairment of the defense. The last of these being the most critical factor. Matthews, 894 P.2d at 288; Eklund, 872 P.2d at 326.

It is undisputed that Collier was incarcerated from the time of her arrest to the time of her sentencing. She claims that she was prejudiced by the oppressive conditions of her incarceration and her anxiety and concern over her inability to be with her children. We recognize that a certain amount of anxiety and concern are inherent in being charged with a crime and that proving anxiety and concern beyond that which normally accompany being charged with a crime is extremely difficult. Gould, 902 P.2d at 539. Moreover, Collier would not have been able to "be with" her children even if she were not incarcerated, as her ex-husband had obtained a temporary restraining order preventing her from having anything other than closely supervised visitation with the children. While Collier's anxiety and concern may have been heightened under the particular circumstances of this case, we are, nevertheless, unpersuaded that, weighing this consideration in the context of the entire Barker analysis, her anxiety and concern

13

would have merited granting her motion to dismiss.

Finally, and most importantly, Collier has failed to allege any specific instances where her defense was impaired by the delay in her case. A mere self-serving assertion that the defendant suffered prejudice is not sufficient to demonstrate that the delay impaired or prejudiced the defense. State v. Weeks (1995), 270 Mont. 63, 74, 891 P.2d 477, 484.

Weighing the facts and circumstances in this case with the factors set forth in Barker establishes that Collier did not suffer any prejudice in her defense from the delay whether those delays were attributable to the State or caused by Collier. Thus, we hold that Collier's right to a speedy trial was not violated and that the District Court did not err in denying Collier's motion to dismiss on speedy trial grounds.

Issue 2.

Did the District Court err in designating Collier a dangerous offender?

The District Court designated Collier a dangerous offender for purposes of parole eligibility because it determined that she continues to represent a "substantial danger" to others, particularly her ex-husband. Section 46-18-404(1)(b), MCA (1993). In State v. Wing (1994), 264 Mont. 215, 870 P.2d 1368, we held that an offender may be designated as a dangerous offender if the district court determines that the offender represents a substantial danger to other persons or society. However, we said that unless the district court articulates why the offender

14

represents a substantial danger, this Court cannot determine if the district court abused its discretion.

Contrary to the State's contention that the District Court's Amended Sentence contains adequate findings for designating Collier a dangerous offender, Collier contends that the court does "nothing more than make conclusory statements which recite the statutory language." Collier argues that the court's findings in this case are insufficient.

This Court has stated in prior opinions that a mere recitation of the statutory language is insufficient. State v. Morrison (1993), 257 Mont. 282, 287, 848 P.2d 514, 517; State v. Henrich (1994), 268 Mont. 258, 271, 886 P.2d 402, 410. Furthermore, we have held that a district court must give specific facts taken from the record of the case as reasons for making its decision. State v. Evans (1995), 272 Mont. 58, 62-63, 899 P.2d 1073, 1075-76.

In its Amended Sentence, the District Court related the following facts as the basis for its determination:

> 12. Defendant continues to demonstrate an unwillingness to accept responsibility for her actions. She blames other people for this crime, including her ex-husband and Bridget Fackrell. Defendant and her ex-husband had disputes. She believed that he was abusive to her and to their children. She had some trouble with visitation of the children. She discussed with others the possibility of having her ex-husband killed in order to remove her problems: These discussions occurred over a period of several months. When someone was apparently willing to take her up on the idea, she presented to them a plan that could have accomplished the death of her ex-husband and diverted suspicion from her.
> As part of the conversations, Defendant gave Fackrell money, a key to her house, and her ATM card and PIN number. She gave Travis Moreland, another person with whom she discussed the matter, a picture of her ex-husband. She described the house and the best means of

15

access to it. She told Fackrell and Moreland that she had moved her belongings so they wouldn't take them in the robbery which she proposed they commit to cover up the offense. In fact, she moved certain of her belongings to the basement of the house, so they would not be taken. In sum, she presented a complete plan for the death of her ex-husband.

Along these same lines; the District Court made the following findings:

> 3. The circumstances under which Defendant committed this crime reflect that it was done with total disregard to the well being of Evan Danno and Defendant's children.
>
> . . .
>
> 9. Defendant did not act under strong provocation. Her actions were taken not in a moment of passion. They occurred over a period of time and culminated at a time when Defendant was trying to reconcile her marriage.
>
> 10. Because of the circumstances surrounding the commission of this crime, at present Defendant's crime will likely reoccur. Defendant has expressed no remorse and has not accepted responsibility for her acts. Defendant continues to place blame on others. Defendant's refusal to take responsibility for the crime makes Defendant likely to commit other crimes, if the action will benefit Defendant.

Accordingly, we conclude that the dangerous offender designation in this case was supported by the record and adequately justified in the District Court's written judgment.

## Issue 3.

Did the District Court err in failing to find that Collier was unable to appreciate the criminality of her conduct?

Collier claims that she was unable to appreciate the criminality of her conduct due to mental disease or defect and that the District Court erred in not sentencing her accordingly. She maintains that based on her mental condition, she should have been placed in a specialized institution rather than a prison.

16

This Court held in State v. Byers (1993), 261 Mont. 17, 861 P.2d 860, that a defendant's mental disease or defect may be evaluated at three different stages of the legal proceedings: before trial, pursuant to § 46-14-103, MCA; during trial, pursuant to § 46-14-102, MCA; and during sentencing, pursuant to § 46-14-311, MCA. We said in Byers that

> the sentencing judge may consider whether at the time of the commission of the offense the defendant was suffering from a mental disease or defect that rendered him unable to appreciate the criminality of his behavior or to conform his behavior to the requirements of the law. Section 46-14-311, MCA. The sentencing judge must then determine whether the mental disease or defect is such that defendant should be confined to a specialized institution.

Byers, 861 P.2d at 866.

A determination of the existence of mental disease or defect rests within the discretion of the sentencing judge. State v. Watson (1984), 211 Mont. 401, 416, 686 P.2d 879, 888-89 (citing State v. Doney (1981), 194 Mont. 22, 35, 636 P.2d 1377, 1385). Here the District Court considered several different evaluations of Collier's mental condition.

The first psychological evaluation was completed on December 2, 1993, by Dr. John Mendenhall of Psychiatric Associates of Great Falls. In his report, Dr. Mendenhall states that Collier

> is perfectly aware of the charges against her and their significance and she is aware of the nature of the crime of which she is accused. She is aware of the consequences of such a crime in the hypothetical sense and she emphatically states that she believes she is competent to stand trial. I see no reason to disagree with her.

A second psychological evaluation was completed on May 17,

17

1994, by Dr. John Van Hassel, a psychologist with Montana State Hospital. Dr. Van Hassel stated in his report that Collier does not appear to indicate any "significant mental illness."

A third psychological evaluation was completed on June 2, 1994, by Dr. Robert Caldwell, staff psychiatrist at Montana State Hospital. In his report, Dr. Caldwell states that Collier is competent and fit to proceed with the matter of the charges against her. He further states that, in his opinion,

> at the time of the alleged offense, Ms. Collier did not suffer from a mental disorder that would have impaired her ability to form the intent to commit [the] offense which has been charged.

A fourth and final psychological evaluation was completed on October 19, 1994, at Collier's request, by Dr. Susan Sachsenmaier, a licensed clinical psychologist. In her report, Dr. Sachsenmaier states:

> There is no doubt that Ms. Collier was suffering from diminished capacity due to her mental illness at the time of the alleged crime. . . . The impossibility of the situation, as she experienced it, led to feelings of desperation and downfall, and the belief that she could no longer survive without escape from Evan. Operating on a deficit of psychological resources, she resorted to a fantasized means of escaping from the situation. She then had the misfortune to be maliciously manipulated by others who held themselves out as her friends, and promised to make real her fantasy of causing him to disappear, but had as their sole object the exploitation of an obviously gullible and naive person.

In addition to providing the court with a written evaluation, Dr. Sachsenmaier testified on Collier's behalf at her sentencing hearing.

Contrary to Collier's assertions, Dr. Sachsenmaier's report does not irrefutably establish Collier's mental incapacity at the

18

time the crime was committed or that Collier suffered from diminished capacity or mental disease or defect. Three prior evaluations of Collier's mental condition are in agreement that although Collier does exhibit some form of mental disorder, the mental disorder was not so severe as to impair her ability to form the mental state necessary to commit the offense for which she was charged.

After reviewing Dr. Sachsenmaier's testimony at the hearing, and the four written evaluations, the District Court determined that Collier's mental capacity at the time of the commission of the charged offense was sufficient to permit her to understand the criminality of her conduct and to conform her behavior to the requirements of the law. Finding that Collier did not suffer from a mental disease or defect, the District Court sentenced her in accordance with § 46-14-312(1), MCA and Title 46, Chapter 18.

Accordingly, while there was some conflict in the evidence, that conflict was resolved by the trial court against Collier. We conclude that the record does support the District Court's determination as to Collier's mental capacity, and, therefore, we hold that the District Court did not abuse its discretion in sentencing Collier to prison rather than to a specialized institution.

### Issue 4.

Did the District Court err in ordering Collier to pay restitution?

The District Court recommended that if Collier is released on

parole or supervised release before the completion of her full sentence, then such parole or supervised release should be subject to several conditions including the payment of restitution and a supervision fee. Collier contends that it was improper for the court to make this recommendation as the court had not suspended or deferred any portion of her sentence and §§ 46-18-201(1)(a) and (b), MCA, allow for restitution only where a portion of the sentence is suspended or deferred. Collier contends that State v. Mazurkiewicz (1990), 245 Mont. 172, 799 P.2d 1066, is controlling on this issue.

We disagree. In State v. Bourne (1993), 259 Mont. 274, 275, 856 P.2d 222, 223, this Court held that Mazurkiewicz is not controlling in situations where restitution is clearly attendant to parole as in the instant case. Rather, we said in Bourne that under § 46-18-202, MCA, and our decision in State v. Klippenstein (1989), 239 Mont. 42, 778 P.2d 892, a district court has the authority to recommend payment of restitution and supervision fees as conditions of parole and that the district court judge is in the best position to determine what can best help in the rehabilitation of an individual convicted of a crime. Bourne, 856 P.2d at 223-24.

Section 46-18-202, MCA (1991), states in part:

> **Additional restrictions on sentence.** (1) The district court may also impose any of the following restrictions or conditions on the sentence provided for in 46-18-201 which it considers necessary to obtain the objectives of rehabilitation and the protection of society:
> . . .
> (e) *any other limitation reasonably related to the objectives of rehabilitation and the protection of society.* [Emphasis added.]

20

Here the District Court *recommended* the payment requirements *if* Collier is released on parole or supervised release. Whether or not the court's recommendations will be followed is up to the parole board.

Accordingly, we hold that the District Court did not err in recommending that Collier pay restitution and supervision fees if and when she is released on parole or supervised release before the completion of her full sentence.

## Issue 5.

Did the District Court err in permitting the County Attorney to argue facts at sentencing supporting the original charge of solicitation of deliberate homicide?

Collier contends that the District Court Judge acted improperly at her sentencing hearing when he permitted the County Attorney to question a police officer at length concerning the preparations Collier made to bring about the death of her ex-husband. Collier argues that the plea agreement and the amended information limited the scope of the charges brought against her and that the County Attorney introduced the evidence for the purpose of demonstrating that the original charge of solicitation of deliberate homicide was justified.

The State argues that since the factual basis for both the original charge of solicitation of deliberate homicide and the amended charge of criminal endangerment was the same, there was no impropriety in allowing the investigating officer to relate the facts of the case. The State also maintains that there was no

21

violation of the spirit or the letter of the plea agreement.

We have repeatedly said that the rules of evidence do not apply at sentencing. Rule 101(c)(3), M.R.Evid.; State v. Farnsworth (1989), 240 Mont. 328, 334, 783 P.2d 1365, 1369; State v. Smith (1988), 232 Mont. 156, 160, 755 P.2d 569, 571-72; State v. Lamere (1983), 202 Mont. 313, 321, 658 P.2d 376, 380. Moreover, in imposing sentence, the sentencing court may consider any relevant evidence relating to the nature and circumstances of the crime, the character of the defendant, the defendant's background history, mental and physical condition, and any evidence the court considers to have probative force. Klippenstein, 778 P.2d at 894.

Furthermore, there is nothing in the plea agreement that prevented the County Attorney from presenting the facts of the case during the sentencing hearing. Instead, the plea agreement includes the following language:

> I.   Defendant agrees to enter a plea of guilty to an amended charge of Criminal Endangerment, in violation of M.C.A. 45-5-207.
> II.   In return, the County Attorney agrees to amend the present charge of Solicitation, Deliberate Homicide to a charge of Criminal Endangerment, in violation of M.C.A. 45-5-207.
> III.  Counsel for defendant and counsel for the State *may make any recommendation and may introduce testimony and/or evidence in support thereof at the time of sentencing.* [Emphasis added.]

Accordingly, we hold that the testimony of the investigating officer was properly admitted during the sentencing hearing.

Issue 6.

Did the District Court err in failing to release Collier or transfer her to a different detention facility due to conditions at

22

the Cascade County jail?

The District Court denied a motion to release Collier or transfer her to a different detention facility. The court determined that conditions at the Cascade County jail were not so deficient as to require a transfer.

The State contends that Collier waived her right to appeal this issue when she pleaded guilty to the charge of criminal endangerment. However, we have already established that specific language in the plea agreement reserved Collier's right to appeal this and other issues.

Collier contends that detaining her in the Cascade County jail was a violation of § 7-32-2222, MCA (1993), which states, in part:

> **Health and safety of prisoners.** (1) Each detention center must comply with state and local fire codes for correctional occupancy and with sanitation, safety, and health codes.

Collier maintains that the Cascade County jail was not in compliance with state and local fire codes or with sanitation, safety, and health codes.

Amy MacKenzie, a sanitary consultant with the Department of Health and Environmental Sciences, inspected the jail in June and December 1993 and again in May 1994. At the hearing on Collier's motion for release or transfer to another detention facility, MacKenzie testified that although the Cascade County jail was not in 100 percent compliance with the guidelines established by her office, the jail was not an imminent health hazard nor was it a public nuisance. Moreover, her office was working with jail staff to continually improve the conditions at the jail.

23

Mel Shultz, a detention officer with the Cascade County Sheriff's Office, testified that some of the unsanitary conditions that Collier complained of were caused by Collier herself. Shultz testified that Collier would leave uneaten food in her cell for long periods of time and that she would refuse to exchange dirty coveralls for clean ones, sometimes wearing the same coveralls for up to a month.

Accordingly, we conclude that Collier has failed to establish that conditions at the Cascade County jail were so deficient as to require her release or transfer to another detention facility and we hold that the District Court did not err in denying her motion.

Affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____
Justices

24

Justice William E. Hunt, Jr., specially concurs.

I concur with the majority regarding Issues 2 through 6. While I concur in the result reached by the majority in Issue 1, I cannot entirely support the rationale used to conclude that Collier's right to a speedy trial was not violated. For this reason, I write separately.

The majority somehow overlooks one of the most important aspects of the Barker test: once a defendant has shown a delay which is presumptively prejudicial, the burden shifts to the State to provide a reasonable explanation for the delay and to show that the defendant was not prejudiced thereby. State v. Gould, (Mont. 1995), 902 P.2d 532, 537, 52 St.Rep. 930, 932. This shift in the burden of proof changes the entire complexion of a speedy trial analysis. To the extent that the majority opinion suggests that Collier was required to show that her constitutional rights were prejudiced, it is simply incorrect. Once a speedy trial analysis is triggered, prejudice will be presumed and it is up to the *State* to show that the defendant was *not* prejudiced by the delay.

Therefore, under the fourth factor of the Barker test, a court must evaluate whether the delay in bringing a case to trial has prejudiced the defendant. Gould, 902 P.2d at 538. As the majority correctly notes, this involves considering possible infringements on three interests which the right to a speedy trial is designed to protect:

    (1)   the prevention of oppressive pretrial incarceration;
    (2)   the minimization of the defendant's anxiety and concern; and

25

(3)    the limitation of impairment of the defense.

It bears repeating, however, that these are three separate interests.    The defendant's interest in avoiding oppressive pretrial incarceration is separate and apart from her interest in minimizing anxiety and concern.    There can be no question that Collier was incarcerated for the entire period prior to trial and that her incarceration was oppressive.    Therefore, this factor must be weighed in her favor.

However, I do not believe a correct application of the Barker test would yield a different result than that which the majority reaches.    Collier has not asserted that her defense was impaired by the delay in bringing the case to trial.    To the contrary, she blames the quality of her legal representation for most of the problems she encountered.    Moreover, the State has explained the reason for that portion of the delay which is attributable to it. Even if the burden of proof were correctly placed on the State, Collier has not alleged circumstances under which she could prevail.    The majority therefore correctly concluded that her right to a speedy trial was not infringed.

William E. Hunter
Justice

26