FILED

06/14/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0497

DA 20-0497

IN THE SUPREME COURT OF THE STATE OF MONTANA

2022 MT 117N

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

RICHARD JAMES SORIA,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DC 18-1010
Honorable Gregory R. Todd, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Pete Wood, Attorney at Law, Boise, Idaho

      For Appellee:

          Austin Knudsen, Montana Attorney General, Jonathan M. Krauss,
Assistant Attorney General, Helena, Montana

          Scott D. Twito, Yellowstone County Attorney, Jacob Yerger, Deputy
County Attorney, Billings, Montana

Submitted on Briefs:  May 18, 2022
Decided:  June 14, 2022

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 On July 20, 2018, Richard Soria unlawfully entered the home of B.H. and assaulted her. The State initially charged Soria with nine offenses. Pursuant to a plea agreement, Soria later pleaded guilty to Sexual Intercourse Without Consent (SIWC), under § 45-5-503, MCA; Aggravated Burglary, under § 45-6-204(2), MCA; and Partner or Family Member Assault (PFMA), under § 45-5-206(1)(c), MCA. The State dismissed the remaining charges. Soria now challenges his sentence, claiming error in the District Court's consideration at the sentencing hearing of information and evidence related to Soria's dismissed charges. Soria argues alternatively that his counsel was ineffective for failing to object to this evidence. Soria also challenges his designation as a Level III sexual offender and argues that the District Court erred in awarding restitution to the victim. We affirm.

¶3 Soria and B.H. had been in a long-term relationship and have two children together. In 2017, Soria was convicted of PFMA, and the court issued a twelve-month no-contact order to protect B.H. and her children. On July 13, 2018, while the no-contact order was in place, B.H. reported to the police that someone stole her cell phone and several other

2

belongings from her vehicle and that she suspected Soria was responsible. Two days later, Soria confronted B.H. outside her home and asked her to explain her whereabouts. When B.H. realized Soria knew where she had been that day, she feared that Soria had been tracking or following her. Police later found B.H.'s stolen cell phone under the spare tire compartment in the trunk of her car. In the days leading up to the assault, Soria sent hostile messages to B.H. and threatened to send explicit videos of B.H. to her co-workers. B.H. later learned that Soria hacked her Facebook account and sent "revenge porn" videos to her friends and co-workers.

¶4     On July 20, 2018, B.H. returned home around midnight and noticed that the sliding glass door in her bedroom was open and that someone had stolen the clothes in her closet. B.H. placed a baseball bat in the track of the sliding glass door to keep it from opening and went to sleep. In the early morning hours, B.H. awakened to the sound of Soria pushing the sliding glass door open. Soria held B.H. down on the bed, forcibly removed her clothing, and digitally penetrated her vagina. B.H. reported that Soria pulled her clitoris repeatedly and tried to penetrate her with his penis but was unable to get an erection. B.H. attempted to call 911, but Soria took her cell phone and put it in his pocket. B.H. reported that Soria cut off patches of her hair, kicked her in the face, and strangled her until she lost consciousness. When she regained consciousness, Soria had left her house. B.H. found some clothes to put on and drove with her kids to a friend's house to call 911. When she finally reached the hospital, B.H. underwent a Sexual Assault Nurse Examiner (SANE) examination and Computed Tomography (CT) scans, and she gave a statement to the

3

police. While B.H. was at the hospital, her friend found a GPS tracker on B.H.'s car and turned that over to the police.

¶5    As the factual basis of his guilty pleas, Soria admitted only that on July 20, 2018, he entered B.H.'s house unlawfully, digitally penetrated her without consent, hit her, and caused her reasonable apprehension of bodily injury. He did not admit to any conduct related to charges the State agreed to dismiss. Soria's Probation Officer, Heather Edwards, compiled a Presentence Investigation (PSI) report and recommended a Level II sexual offender status. The PSI set forth the entire factual basis for the State's charges against Soria, including conduct he did not admit in his guilty pleas—primarily, stealing B.H.'s belongings, pulling B.H.'s clitoris, attempting to penetrate her with his penis, and strangling her.

¶6    Soria submitted a sentencing memorandum, which included an expert report from Dr. Felice Gersh, a gynecologist and former OB/GYN professor, and a psychosexual evaluation (PSE) that Licensed Clinical Social Worker Lisa H. Hjelmstad conducted before Soria entered a guilty plea. Dr. Gersh opined that the medical evidence contradicted B.H.'s account of the assault in that it did not establish that B.H. had been strangled. Hjelmstad recommended a Level II sexual offender designation. Both Gersh and Hjelmstad had access to the complete records from the case and recounted the same factual background in their reports that was reflected in the PSI.

¶7    At the sentencing hearing, the State called Detective Denise Baum and Dr. Michael D. Sullivan, who had conducted a second PSE after Soria pleaded guilty. Detective Baum

testified to her investigation of the offense, including her observations of and conversation with B.H. at the hospital, other persons she interviewed, Soria's actions after the offense, Baum's subsequent conversations with B.H. about the "revenge porn" sent from the victim's Facebook account to her employers after the offense, B.H.'s fears that Soria had not been caught yet, and B.H.'s ongoing pain in her neck from being choked. Detective Baum also testified to events on the day of Soria's arrest, including B.H. finding a note from him on her windshield at work and being terrified to go to the daycare to pick up her children without an officer escort. Finally, Detective Baum described the fruits of searching Soria's vehicle, including women's clothes with blood on them and a ledger with information confirming that it was he who had hacked B.H.'s Facebook and e-mail accounts. Soria made no objection during any of the detective's testimony. The State also admitted through Detective Baum, without objection, ten photographs of the crime scene taken during the investigation.

¶8     Dr. Sullivan testified to his evaluation of Soria and recommended a Level III sexual offender designation because Soria met the criteria for a "sexually violent predator." Sullivan explained the process he used during the evaluation and some differences that might account for the disparate recommendations: the seven-month gap between PSEs; Soria's guilty plea after the first PSE and before the second PSE; a mis-scored risk assessment factor in the first PSE; and a slight difference in scores on the "Stable-2007" scale, which measures treatment needs and likelihood of recidivism.

¶9 Soria did not call any witnesses. The court heard B.H.'s written victim impact statement, the State's and Soria's recommendations, and Soria's allocution. The court designated Soria a Level III sexual offender and sentenced him to a total of 40 years' incarceration, none suspended.

¶10 Soria challenges the District Court's reliance on allegations and evidence that pertained to his dismissed charges. He argues that the court violated his procedural and substantive due process rights; that the State violated the plea agreement by presenting evidence of charges it had dismissed; and that his counsel was ineffective for failing to contemporaneously object to the admission of this evidence.

¶11 We review criminal sentences for legality to determine whether they are statutorily authorized. *State v. Lodahl*, 2021 MT 156, ¶ 11, 404 Mont. 362, 491 P.3d 661. We review de novo whether the State breached a plea agreement. *State v. Lewis*, 2012 MT 157, ¶ 13, 365 Mont. 431, 282 P.3d 679. Ineffective assistance of counsel claims raise mixed questions of law and fact, which we also review de novo. *State v. Heavygun*, 2011 MT 111, ¶ 8, 360 Mont. 413, 253 P.3d 897.

¶12 "Whenever an investigation is requested by the court, the probation and parole officer shall promptly inquire into and report upon . . . the circumstances of the offense" and "the harm caused, as a result of the offense, to the victim." Section 46-18-112(1)(c), (e), MCA. The report also may include "prior criminal history" and an "official version of the offense or offenses." Section 46-18-112(2)(a), (c), MCA.

¶13    A district court "is given a wide scope of inquiry in sentencing." *State v. Klippenstein*, 239 Mont. 42, 45, 778 P.2d 892, 895 (1989).  The rules of evidence do not apply to sentencing hearings.  *State v. Hill*, 2009 MT 134, ¶ 20, 350 Mont. 296, 207 P.3d 307.  "A trial court may consider the broad spectrum of incidents making up the background of an offender in determining the proper sentence," including the facts "leading to the . . . charges" and "any evidence the court considers . . . probative[.]" *State v. Baldwin*, 192 Mont. 521, 524, 629 P.2d 222, 224 (1981) (citing § 46-18-101, MCA); *State v. Mason*, 2003 MT 371, ¶ 23, 319 Mont. 117, 82 P.3d 903 (citing *State v. Collier*, 277 Mont. 46, 63, 919 P.2d 376, 387 (1996)).

¶14    Because a defendant may not be sentenced based upon misinformation, however, the court must afford the defendant an opportunity to challenge the accuracy of the information.  *State v. Hocevar*, 2000 MT 157, ¶ 101, 300 Mont. 167, 7 P.3d 329. "When a criminal defendant contests matters in a presentence report, the defendant has an affirmative duty to present evidence establishing inaccuracies." *Mason*, ¶ 21.

***Reliance on Evidence of Dismissed Charges***

¶15    Generally, "we will not hold a district court in error based on an objection raised for the first time on appeal." *State v. Coleman*, 2018 MT 290, ¶ 7, 393 Mont. 375, 431 P.3d 26 (citation omitted).  We permit a defendant to challenge a sentence for the first time on appeal if the sentence was "facially illegal (i.e., of a type or character not authorized by statute . . .)" or if the sentence was "facially legal but authorized by a facially unconstitutional statute." *State v. Thibeault*, 2021 MT 162, ¶ 9, 404 Mont. 476,

7

490 P.3d 105 (citing *State v. Lenihan*, 184 Mont. 338, 342-43, 602 P.2d 997, 999-1000 (1979)) (other citations omitted). A sentence is illegal "if the sentencing court lacked statutory authority to impose it, if the condition falls outside the parameters of the applicable sentencing statutes, or if the court did not adhere to the affirmative mandates of the applicable sentencing statutes." *State v. Bull*, 2017 MT 247, ¶ 11, 389 Mont. 56, 403 P.3d 670 (citation omitted). "[W]hen a district court, if provided the opportunity to consider the error now asserted on appeal, could nevertheless have imposed the same sentence, the illegality requirement of the *Lenihan* exception has not been met." *Bull*, ¶ 11.

¶16 At the sentencing hearing, Soria did not raise a single objection. He did not object to the testimony of Detective Baum, to the exhibits depicting the crime scene, or to the testimony of Dr. Sullivan. He did not object to the State's introduction of facts related to the dismissed charges; he did not present witnesses to refute the information in the PSI; and he did not argue in the District Court that the PSI contained inaccuracies or that the District Court should not rely on certain information within it. To the contrary, Soria relied on the PSI in his sentencing memorandum and submitted expert reports that relied in part on information in the PSI. At the conclusion of the hearing, defense counsel noted for the record that he had reviewed the PSI with Soria and "did not have any changes or corrections to that document."

¶17 Soria argues for the first time on appeal that requiring him to rebut the State's allegedly unfounded allegations at the sentencing hearing violates his procedural and substantive due process rights. He asks us to overrule precedent that permits introduction

8

of evidence relevant to dismissed charges. *See Walker*, ¶ 21; *Mason*, ¶ 25; *Collier*, 277 Mont. at 63, 919 P.2d at 387; *Baldwin*, 192 Mont. at 524, 629 P.2d at 224. Soria also argues that Montana's sentencing scheme, as applied to him, is unconstitutional. But he did not object in the District Court to his burden to rebut this evidence, did not argue that the burden deprived him of a constitutional right, and did not raise his constitutional theory in the District Court. He used the statements in the PSI to poke holes in B.H.'s allegations, shared the same information with his own experts, and submitted B.H.'s version of the incident through his expert reports. Soria submitted Dr. Gersh's report to argue that B.H.'s medical findings and subsequent behavior were not consistent with strangulation and "that the physical harm here was not substantial."

¶18 Finally, Soria contends that the sentence was unlawful because the District Court considered some information from the investigation that was not included in the PSI. But Soria's sentences were within statutory parameters, and he does not contest that the court could have imposed the same sentence without such consideration. We decline to review Soria's unpreserved claims on appeal. *See Coleman*, ¶¶ 8-9 (holding that the Court will not review as-applied challenges to sentencing statutes for the first time on appeal); *State v. Youpee*, 2018 MT 102, ¶ 11, 391 Mont. 246, 416 P.3d 1050 (declining review of unpreserved challenge to sentence where the court did not exceed statutory mandates); *State v. Parkhill*, 2018 MT 69, ¶ 16, 391 Mont. 114, 414 P.3d 1244 (declining to review unpreserved as-applied challenge to sentencing statute); *Bull*, ¶¶ 15-16 (declining review

9

of defendant's parole restriction where its imposition was within the scope of the district court's statutory authority).

¶19 Likewise, Soria does not substantiate with reference to the record his claim that the State violated the plea agreement by introducing B.H.'s allegations in their entirety. Again, Soria presents a new argument for the first time on appeal. In his Sentencing Memorandum, Soria's counsel advised the court:

> It is anticipated that the State will request a forty[-]year term of incarceration. The justification for this sentence will likely center around the violent nature of the crimes, as well as [Soria's] past behavior toward [B.H.].

Soria acknowledged at sentencing, and again acknowledges on appeal, that the State presented argument and evidence consistent with its stated recommendation in the plea agreement—a twenty-year sentence for SIWC, a forty-year sentence for aggravated burglary, and a one-year sentence for PFMA.

¶20 The State argued to the sentencing court that Soria's sentencing recommendation of a twenty-year prison term

> really does not properly encapsulate either the harm done to the victim or the danger presented by the defendant to this community. In fact, it really only holds the defendant accountable for committing one crime, sexual intercourse without consent. The aggravated burglary portion of this offense is subsumed into that recommendation as suspended time and run[s] concurrently with Count 1. It's almost as though, under the defendant's recommendation, that count has been dismissed.

Soria responded that the State's recommendation was similar to what would be imposed for deliberate homicide and that his recommendation accounted for the defendant's individual circumstances and comparable sentences imposed for similar crimes. He did

not object to the District Court's consideration of any evidence that could be "relevant to the disposition." *See Hill*, ¶ 27 (citation and quotation omitted). Soria has not demonstrated that the State breached the plea agreement.

***Level III Sexual Offender Designation***

¶21 Soria argues for the first time on appeal that the District Court's imposition of a Level III sexual offender designation was illegal and an abuse of discretion. Soria contends that the court made no findings to support designating him a "sexually violent predator" and ignored the recommendation for a Level II designation in the first PSE even though the scored results of both PSEs were substantially similar.

¶22 We review a district court's designation of a sexual offender level for abuse of discretion. *Hill*, ¶ 22. The district court designates a sexual offender level in its discretion and is not required to accept the recommendation of a PSE. *Hill*, ¶ 42. "A district court abuses its discretion when it acts arbitrarily without employment of conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice." *Hill*, ¶ 42 (citation and quotation omitted).

¶23 "Upon sentencing [an] offender, the court shall[] . . . designate the offender as level 1, 2, or 3[] and . . . designate a level 3 offender as a sexually violent predator." Section 46-23-509(3)(b)-(c), MCA (2019).[1] A Level III designation is appropriate when "the risk of a repeat sexual offense is high, there is a threat to public safety, and the sexual offender evaluator believes that the offender is a sexually violent predator."

---

[1] Because § 46-23-509, MCA, was amended, we use the version in effect at the time of sentencing.

11

Section 46-23-509(2)(c), MCA (2019). A "sexually violent predator" is a person who "has been convicted of . . . a sexual offense and who suffers from a mental abnormality or a personality disorder that makes the person likely to engage in predatory sexual offenses." Section 46-23-502(11), MCA. A "mental abnormality" means "a congenital or acquired condition that affects the mental, emotional, or volitional capacity of a person in a manner that predisposes the person to the commission of one or more sexual offenses to a degree that makes the person a menace to the health and safety of others." Section 46-23-502(2), MCA. A "predatory sexual offense" means "a sexual offense committed against a stranger or against a person with whom a relationship has been established or furthered for the primary purpose of victimization." Section 46-23-502(5), MCA.

¶24 Sullivan testified at the hearing that both PSEs diagnosed Soria with borderline psychopathy and explained some of the possible explanations for the disparate recommendations in sexual offender levels. The second PSE concluded that Soria's offense may be classified as an "anger retaliatory rape"—a situation in which the offender is exacting "perceived justice or getting even with a woman for real or perceived wrongs." Sullivan testified that the term "anger retaliatory rape" is a descriptive term used to conceptualize the motivation and the dynamics of a sexual offense. He said the term was coined by behavioral scientists and is one of numerous "profiles" of a person who commits a sexual offense. Sullivan further testified that he believed Soria met the statutory definition of a sexually violent predator as someone who "establish[ed] or further[ed] a relationship for the purpose of a sexual offense."

12

¶25     The second PSE characterized Soria as "a high risk sexual and violent offender," stating that "he appears to have stalked the victim and assaulted her violently and sexually while a no-contact order was in place." (Emphasis omitted.) It utilized three risk assessment scales to make a prediction regarding Soria's likelihood of recidivism. The first of these tests diagnosed Soria as a "moderate" risk. The second test placed Soria in the "high needs group," meaning the likelihood of sexual recidivism is 36% over five years and the likelihood of violent recidivism is 42% over five years. The third test placed Soria in the 90th percentile of risk groups, where the likelihood of violent (including sexual) recidivism is 58% over five years and 78% over twelve years.

¶26     The District Court noted that Soria's psychological finding in the PSEs was "significant" and that Soria was at risk of reoffending. Based on Sullivan's report and testimony, we conclude that the Level III designation in Soria's case was not illegal. The District Court did not act arbitrarily without employment of conscientious judgment or exceed the bounds of reason when it designated Soria a Level III offender.

***Ineffective Assistance of Counsel***

¶27     To prevail on his IAC claim, Soria must establish that (1) his counsel's performance was deficient, and (2) the deficient performance prejudiced his defense. *See State v. Haldane*, 2013 MT 32, ¶ 32, 368 Mont. 396, 300 P.3d 657. Soria contends that his attorney's failure to object to evidence of the dismissed charges in the PSI and at the sentencing hearing was deficient. But he also acknowledges that an objection on this ground would have contradicted clearly established precedent. Because we have long held

13

that a sentencing court may consider all circumstances of the offense when sentencing a defendant, an objection would not have been well-taken. *See State v. Walker*, 2007 MT 205, ¶ 21, 338 Mont. 529, 167 P.3d 879; *Mason*, ¶ 25; *Collier*, 277 Mont. at 63, 919 P.2d at 387; *Baldwin*, 192 Mont. at 524, 629 P.2d at 224. Soria's counsel's lack of objection on these grounds did not constitute deficient performance. *See State v. Howard*, 2011 MT 246, ¶ 26, 362 Mont. 196, 265 P.3d 606 ("Counsel's failure to object does not constitute ineffective assistance when the objection lacks merit and properly would have been overruled").

¶28    Soria also has not shown that counsel's objection, had he made one and the court sustained it, likely would have changed the outcome of the proceeding. *See Haldane*, ¶ 37. Despite the District Court referring to some conduct Soria did not admit, Soria has not demonstrated that, had counsel objected to evidence of or reliance on such conduct, the court likely would have imposed a different sentence. The sentence imposed was the same sentence Soria knew the State would recommend. And even the report of his own expert, Lisa Hjelmstad, suggests that the court would have accepted the State's sentencing recommendation regardless of the evidence to which Soria now objects. Hjelmstad's evaluation occurred before Soria entered his plea and did not accept as true the victim's allegations, which Soria declined to discuss. Nonetheless, based on her comprehensive testing and the past conduct that he did acknowledge, Hjelmstad concluded, among other findings, that Soria:

> is in the highest risk category for likelihood of re-offense specific to intimate partner violence[;]

14

.   .   .

is in the highest risk category of the 7 risk categories for the likelihood of re-offense specific to domestic assault. Only 6% of known domestic violence perpetrators fall in this category; 94% score lower. 74% of perpetrators in this category commit another assault against their partner or a future partner that will come to the attention of law enforcement within an average of 5 years[; and]

.   .   .

acknowledged [violent behaviors that include] physical and emotional abuse.

She also found "indication at the time of the alleged offense and prior to Mr. Soria's arrest that he did in fact pose a lethal risk of harm to his partner." When discussing Soria's history of domestic violence, Hjelmstad noted that, in addition to causing physical injury, Soria "exacted [emotional injury] in callous and detached ways with no regard for impact on his victims." She found "[s]ignificant intimate partner violence signaling imminent harm[.]"

¶29　Explaining its reasons for the sentence, the District Court not only discussed the events of July 20, 2018, but also noted Dr. Sullivan's "significant" finding that Soria was "at the low end of the psychopath range," the "reign of terror" Soria had committed against B.H. over the course of a week (both before and after the night of the offenses), and that B.H. would "suffer a lifetime of emotional trauma." With or without the alleged "misinformation" or inaccuracies Soria claims the court unfairly considered, the uncontested information before it at the time of sentencing likely would have led the court to impose the same sentence. *See State v. Finney*, 281 Mont. 58, 63, 931 P.2d 1300, 1303-04 (1997) (noting that "an abundance of other evidence," not just the evidence

15

challenged by the defendant, supported the sentence).  We conclude that Soria has not demonstrated ineffective assistance of counsel.

*Restitution*

¶30    Soria asserts that the District Court erred in ordering him to pay $608.14 in restitution to B.H. because she did not testify or provide an affidavit describing her loss, as required by statute.  The State concedes that the District Court granted restitution without a victim affidavit or testimony; it argues, however, that Soria failed to object to the imposition of restitution at the sentencing hearing.

¶31    We review restitution awards de novo as mixed questions of law and fact.  *Lodahl*, ¶ 11.  To recover restitution, a victim who has sustained a pecuniary loss because of a crime must submit "an affidavit that specifically describes the victim's pecuniary loss and the replacement value in dollars of the loss."  Section 46-18-242(1)(b), MCA.  We have declined to review an argument that restitution was imposed without a supporting affidavit when the defendant failed to raise it in the district court.  *See, e.g.*, *State v. Johnson*, 2011 MT 286, ¶ 14, 362 Mont. 473, 265 P.3d 638; *State v. Schmidt*, 2009 MT 450, ¶ 75, 354 Mont. 280, 224 P.3d 618.

¶32    Soria concedes that *Johnson* and *Schmidt* are on point but asks this Court to overrule them because a court may not impose a condition of sentence when it lacks the statutory authority.  Citing *City of Kalispell v. Salsgiver*, 2019 MT 126, ¶ 33, 396 Mont. 57, 443 P.3d 504, he contends that the absence of a victim affidavit made this an illegal sentence, which the court lacked the power to impose.  Unlike *Salsgiver*, however, where

there was no statutory basis for the imposition of a contract fee or an interest rate on the defendant's fines, § 46-18-242, MCA, requires a court to impose restitution. *See Salsgiver*, ¶¶ 42-43. As it was within the District Court's statutory authority to do so, Soria's failure to object to the court's oral pronouncement of restitution at sentencing waives the issue on appeal. *See Johnson*, ¶ 14.

¶33 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. Resolution of the issues on appeal, many of which Soria failed to preserve, is controlled by settled law or by the clear application of applicable standards of review. We affirm Soria's conviction and the District Court's August 18, 2020 Judgment.

/S/ BETH BAKER

We Concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR