FILED

11/01/2017

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 15-0411

DA 15-0411

## IN THE SUPREME COURT OF THE STATE OF MONTANA

### 2017 MT 266

STATE OF MONTANA,

        Plaintiff and Appellee,

v.

MICHAEL KEITH SPELL,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Seventh Judicial District,
                      In and For the County of Richland, Cause No. DC-12-09
                      Honorable Richard A. Simonton, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

        Wendy Holton, Attorney at Law, Helena, Montana

        For Appellee:

        Timothy C. Fox, Montana Attorney General, Tammy A. Hinderman,
        Assistant Attorney General, Helena, Montana

        Mike Weber, Richland County Attorney, Joel Thompson, Special Deputy
        County Attorney, Sidney, Montana

                      Submitted on Briefs:  September 20, 2017

                                Decided:  November 1, 2017

Filed:

_____
                        Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1      This is an appeal from the Seventh Judicial District Court's determination that Michael Spell (Spell) was competent to stand trial and that, at the time of the offense, Spell was able to appreciate his behavior and conform to the requirements of the law. We affirm.

¶2      Spell presents the following issues for review:

*1. Whether the District Court erred when it found Michael Spell competent to stand trial.*

*2. Whether the District Court erred when it found that, at the time of the offense, Michael Spell was able to appreciate his behavior and conform his conduct to the requirements of the law.*

*3. Whether sentencing Michael Spell to prison violated his constitutional rights to be free from cruel and unusual punishments and to human dignity.*

## PROCEDURAL AND FACTUAL BACKGROUND

¶3      On January 7, 2012, Gary Arnold returned home after a morning walk and noticed his wife, Sherry Arnold (Arnold) was not there.[1]  As she was an avid walker and jogger, Gary assumed Arnold had gone out for a jog.  Gary became concerned when Arnold did not return home and went out to look for her.  When Gary could not find Arnold, he contacted family and local law enforcement.  A search for Arnold ensued.

---

[1] The following facts are taken from the Affidavit in Support of Motion for Leave to File an Amended Information, the District Court's Order Finding Defendant Competent to Stand Trial, the District Court's May 18, 2015 Judgment and Sentence Order, testimony given at the competency hearing on March 24 and 25, 2015, and testimony given at the sentencing hearing on April 17, 2015.

¶4 The search for Arnold turned up one of her running shoes on one of her known jogging routes along Holly Street, otherwise known as the "Truck Route" in northeast Sidney, Montana. An investigation regarding Arnold's disappearance began. The Federal Bureau of Investigation (FBI) joined the investigation on January 9, 2012.

¶5 On January 11, 2012, law enforcement received information regarding communications made between Spell and his family members concerning a woman that he and another man, Lester Waters (Waters), kidnapped and killed. The tip stated that Spell contacted his girlfriend, Angel Cruz (Cruz), and told her he was stranded in North Dakota and was attempting to get home to Parachute, Colorado. Cruz stated that Spell and Waters left Parachute on January 4, 2012, in a green Ford Explorer to look for work in the oil fields near Williston, North Dakota. Spell's father was also aware of Spell's involvement in the kidnapping and homicide of a woman.

¶6 On January 12, 2012, FBI Special Agents spoke with Cruz, who informed them that Spell and Waters abducted a woman and killed her. Cruz told the agents that Spell said Waters made Spell shove the woman's face in a "puddle of mud, like water, until she was dead" and then forced Spell to bury the woman's body. Spell said he was afraid that Waters would kill him. Spell also told Cruz that Waters made Spell smoke crack cocaine while driving to North Dakota, and that he was now in Rapid City, South Dakota.

¶7 Also on January 12, 2012, a 1993 green Ford Explorer with a Colorado license plate was located by police officers in Williston, North Dakota. The driver matched Waters' description. Waters was arrested and detained for questioning. An inventory of

Waters' personal belongings revealed a purchase receipt dated January 7, 2012, from a Walmart in Williston for items including a shovel.

¶8    On January 13, 2012, FBI Special Agents located and interviewed Spell. Spell confessed that he and Waters abducted and killed Arnold and provided the following narrative to investigators. Spell stated he and Waters left Parachute, Colorado, two or three days before they abducted Arnold while she was jogging. Waters was smoking crack cocaine during their trip and Waters told Spell that crack cocaine brought "the devil" out in Waters. Waters began talking about kidnapping and killing a female. When the two were driving through a town and saw a woman running along the road, Waters told Spell to grab and pull her into their vehicle as she jogged by. Waters parked on the side of the road and Spell got out of the vehicle, grabbed the woman, and forced her into the vehicle. In doing so, the woman's shoe fell off. This made Waters mad, and he threw Spell's knit hat into the ditch as punishment. Spell's hat was later found in a large ditch near the area where Arnold's shoe was recovered.

¶9    Spell stated that once the woman was in the car, Waters got into the back seat and "choked her out." Waters said he would kill Spell and Spell's family if he ever told anyone what happened. Waters then threw the woman's clothes in a dumpster behind a truck stop before he and Spell dropped off Arnold's body outside of town. They went back into Williston and purchased a shovel at Walmart. At the direction of Waters, Spell dug a hole near where they dropped Arnold's body off and placed her in it. Afraid of what Waters might do next, Spell stole Waters' telephone and began hitchhiking until he got to Rapid City, South Dakota.

4

¶10 On February 28, 2012, Special Agent Overby of the Williams County Law Enforcement Center, Williston, North Dakota, interviewed Michael Pruit, who had been incarcerated with Spell at the Williams County Law Enforcement Center Jail. Pruit stated Spell told him Waters was the instigator in the kidnapping of Arnold and told Spell what to do. Spell said Arnold was jogging on a path and he approached her. Spell said Arnold said "hi" as they passed each other. Spell said he turned around and speared Arnold in the back of the head and knocked her down, choked her, pushed her face into some water, and drowned her. Spell told Pruit the reason for the kidnapping was that he and Waters were high on drugs and Waters wanted to have sex.

¶11 On March 19, 2012, Waters assisted in the search for Arnold. He and Special Agent Overby found Arnold's body buried outside Williston, North Dakota. An autopsy revealed a black and gritty, but unidentified material in Arnold's stomach and trachea.

¶12 On February 17, 2012, the Richland County Attorney filed an Information, charging Spell with Aggravated Kidnapping, a felony. On February 28, 2012, Spell entered a plea of not guilty to this charge. On April 27, 2012, additional felony charges were brought against Spell including Deliberate Homicide and Attempted Kidnapping. On May 15, 2012, Spell entered a plea of not guilty to these two charges.

¶13 Trial was scheduled to begin on January 6, 2014. This date was continued because on October 31, 2013, Spell filed a motion for an order to determine his ability to understand the proceedings against him and to assist in his own defense, and to determine whether he was suffering from a developmental disability that rendered him unable to appreciate the criminality of his behavior or to conform his behavior to the requirements

5

of the law. On November 4, 2013, the District Court committed Spell to the Montana State Hospital for an examination pursuant to § 46-14-202, MCA. Spell was transported to the Montana State Hospital in Warm Springs (State Hospital), Montana, on November 13, 2013. Following a lengthy evaluation, mental health professionals at the State Hospital determined Spell was fit to proceed. This determination was contrary to the findings of J. Gregory Olley, Ph.D. (Dr. Olley), and Craig W. Beaver, Ph.D. (Dr. Beaver), the defense experts.

¶14 On March 24 and 25, 2014, a hearing was held to determine Spell's competency to stand trial. The District Court heard testimony from and read the reports of expert witnesses Dr. Olley, Dr. Beaver, and Dr. Virginia Hill (Dr. Hill).[2] The District Court concluded that while "the quality of the Defendant's presentation at the two day hearing and his proposed findings and brief are very impressive. . . . [T]he test of competency is not dependent upon appearances." On May 16, 2014, the District Court determined that Spell was competent to stand trial.

---

[2] Dr. Olley is an expert in intellectual disability and is a licensed psychologist with a Ph.D. in psychology. He is a member of the American Psychological Association, which is the division on intellectual and developmental disabilities. Dr. Olley interviewed Spell and others. Dr. Beaver is licensed to practice psychology and holds a clinical Ph.D. in psychology and diplomate status in clinical neuropsychology. He interviewed Spell, Spell's uncles and aunts, brother, special education teacher, art teacher, and former sister-in-law. Dr. Beaver observed an interview January 13, 2014, by Dr. Hill and Dr. Tim Casey at the State Hospital. Dr. Hill is a psychiatrist at the State Hospital who is board certified in forensic psychiatry. Her report was prepared from information derived from a social worker on Spell's case, background information available to her, observations by herself and staff at the State Hospital, the assessments by a psychologist, a physician, rehabilitation staff, nursing staff, psychiatric technicians, testing, lab tests, interviews, and twenty-four/seven observations for sixty days. Dr. Hill met with staff two hours each day to get reports over three shifts.

¶15 On October 22, 2014, pursuant to a written Acknowledgment of Rights and Plea Agreement, Spell pled guilty to the Deliberate Homicide charge. The District Court ordered a presentence investigation. The plea agreement provided that the Attempted Kidnapping charge would be dismissed, and it was dismissed by the District Court after holding a sentencing hearing on April 17, 2015. On May 18, 2015, the District Court sentenced Spell to the Montana State Prison for a term of 100 years for Deliberate Homicide, a felony, and violation of § 45-5-102(1)(b), MCA.

## STANDARD OF REVIEW

¶16 When reviewing a district court's finding of competence, we inquire whether substantial evidence supports the district court's decision that the defendant was fit to proceed to trial. *State v. McCarthy*, 2004 MT 312, ¶ 20, 324 Mont. 1, 101 P.3d 288 (citations omitted). The evidence may conflict, but it is substantial if any reasonable trier of fact could rely upon the evidence in support of its conclusion. *State v. Statczar*, 228 Mont. 446, 456, 743 P.2d 606, 613 (1987).

¶17 This Court reviews a criminal sentence that imposes a year or more of actual incarceration for legality. *State v. Herman*, 2008 MT 187, ¶ 11, 343 Mont. 494, 188 P.3d 978. The district court's determination of the existence of mental disease, disorder, or developmental disability pursuant to § 46-14-311, MCA, is reviewed for an abuse of discretion. *State v. Gallmeier*, 2009 MT 68, ¶ 11, 349 Mont. 424, 203 P.3d 852 (citations omitted). A district court abuses its discretion when it "acts arbitrarily without employment of conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice." *State v. Burke*, 2005 MT 250, ¶ 11, 329 Mont. 1, 122 P.3d 427.

7

¶18 This Court will exercise plenary review of constitutional issues, and a district court's decisions on constitutional issues are reviewed for correctness. *State v. Egdorf*, 2003 MT 264, ¶ 12, 317 Mont. 436, 77 P.3d 517 (citations omitted).

## DISCUSSION

¶19 *1. Whether the District Court erred when it found Michael Spell competent to stand trial.*

¶20 Section 46-14-103, MCA, sets the standard for determining whether a criminal defendant is mentally competent to stand trial. It states,

> A person who, as a result of mental disease or disorder or developmental disability, is unable to understand the proceedings against the person or to assist in the person's own defense may not be tried, convicted, or sentenced for the commission of an offense so long as the incapacity endures.

Section 46-14-103, MCA. The District Court must determine "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *McCarthy*, ¶ 21.

¶21 All three expert witnesses agree that Spell is intellectually disabled. His raw IQ score is around 70. Although he completed the ninth grade, he reads at a third-grade level. For many activities, he has the mental age of an eleven-year-old. However, Dr. Olley testified at Spell's competency hearing that some intellectually disabled persons "can learn and can communicate adequately with their attorneys to be able to work with their attorneys," while Dr. Beaver agreed that intellectually disabled persons may still be "competent to proceed with their cases in court."

¶22    Although intellectually disabled, substantial evidence in the record shows Spell was competent to stand trial and enter his guilty plea. Whereas Dr. Olley and Dr. Beaver spent a limited number of hours interviewing Spell and administering tests, the State Hospital utilized a multi-disciplinary team assessment, including staff observations of Spell on a twenty-four-hour-a-day, seven-day-a-week basis for sixty days. In doing so, the State Hospital witnessed and gave more weight to Spell's actual adaptive functioning at the time of his competency evaluation. Dr. Hill testified Spell was "very motivated for the things he wanted," and that she had "rarely seen so much perseverance, relentless pursuit of the goals of his choosing," such as getting to Level 3 at the State Hospital so he could play video games. Spell was also motivated to stay at the State Hospital, especially after he learned that you cannot smoke in prison.

¶23    Spell complained of depression, anxiety, sleep problems, paranoia, voices, and poor memory, but his behavior was not consistent with those complaints. Dr. Hill testified that Spell's psychiatric complaints seemed to increase towards the end of his time at the State Hospital, and after he learned about the type of symptoms that generally can lead to a finding of guilty but mentally ill. Spell did not appear to experience any of these symptoms when interacting with other patients, as he would laugh, joke, enjoy games, and watch television. Spell was also vocal about his cognitive functioning while at the State Hospital. Dr. Hill testified this was unusual as patients with intellectual disabilities generally "pretend they understand, they try to fit in, they don't like an emphasis on their impairments . . . ." Dr. Hill also thought it unusual that Spell gravitated toward higher-functioning patients rather than other developmentally disabled patients,

9

and was observed manipulating lower-functioning peers and being duplicitous with staff. Spell's behavior made it difficult for Dr. Hill to find a deficit in adaptive functioning during Spell's time at the State Hospital.

¶24 Dr. Hill acknowledged Spell's deficits in his adaptive functioning growing up, but also acknowledged how Spell has matured since being a teen. Dr. Hill and staff at the State Hospital "were quite impressed that his adaptive functioning was a lot higher than [they] expected." Dr. Hill attributed Spell's progress to brain development and his abstention from alcohol and drug use for the two years prior to his evaluation. Spell admitted he smoked marijuana almost every day that he could get ahold of it since the age of thirteen until his arrest in this case.

¶25 A Colorado court determined Spell was incompetent to stand trial when he was younger. In one case, two professionals examined Spell, and came to differing conclusions regarding Spell's competency. However, the doctor who determined Spell was incompetent concluded Spell's factual understanding of courtroom proceedings was not impaired, his memory of the event was not impaired, and he was able to consult with his attorney to a reasonable degree. Despite these findings, Spell was found incompetent because he was unable "to make a decision whether or not to testify on his own" without the assistance of counsel.

¶26 Years later, Spell seems to have a good understanding of the legal process and criminal proceedings. Spell made progress in and asked pertinent questions regarding defending his case in the Legal Pathways group, where State Hospital patients are taught about courtroom and legal processes. Dr. Hill interviewed Spell five times using a

modified competency assessment instrument, and he adequately answered questions regarding criminal proceedings. Dr. Hill also testified that Spell had "a very good relationship with his attorneys, he respects their competence, he trusts them. He is able to talk quite clearly about the events that pre-dated the alleged crime and also talk about events right after the alleged crime." In discussions with Dr. Hill, Spell was "polite and rational and cooperative with questions." He understood he could not be compelled to testify in court and was aware of the possible pleas. He knew that if he did not understand what was going on in court, he could whisper to his attorney to get things clarified.

¶27    As the District Court put it in its Order Finding Defendant Competent to Stand Trial, Spell "knew what behaviors would allow him to meet his goals" and allow him to serve his sentence at the State Hospital instead of the Montana State Prison. Spell has the ability to consult with and understand his lawyer and understands the proceedings against him. Substantial evidence supports the District Court's finding that Spell is competent to stand trial and was competent when he entered his guilty plea.

¶28    *2. Whether the District Court erred when it found that, at the time of the offense, Michael Spell was able to appreciate his behavior and conform his conduct to the requirements of the law.*

¶29    Pursuant to § 46-14-311, MCA, if a defendant pleads guilty and the sentencing court concludes that such defendant suffers "from a mental disease or disorder or developmental disability that rendered the defendant unable to appreciate the criminality of the defendant's behavior or to conform the defendant's behavior to the requirements of law" at the time of the offense, the court must order a presentence investigation and a

11

report on the investigation. Section 46-14-311(1), (2), MCA. If the opinion concludes that the defendant could not conform his or her behavior to requirements of the law according to § 46-14-312(1), MCA, the court shall commit the defendant to the custody of the director of the Department of Public Health and Human Services (DPHHS). Section 46-14-312(2), MCA; *Gallmeier*, ¶ 13; *Burke*, ¶¶ 14-15. It is the defendant's burden to prove that he or she suffered from a mental disease or defect as defined in § 46-14-311, MCA, at the time of the offense. *Gallmeier*, ¶ 13 (citing *State v. Rathbun*, 2003 MT 210, ¶ 15, 317 Mont. 66, 75 P.3d 334).

¶30    Spell argues that he suffered from a developmental disability at the time of the offense that rendered him unable to conform his behavior to the requirements of the law. Further, Spell alleges that because Dr. Beaver opined that Spell's intellectual disability prevented him from being able to conform his behavior to the law, the District Court should have sentenced Spell to the custody of the Director of DPHHS so that he could be treated by a staff that is trained and knowledgeable about adults who are intellectually disabled. Spell emphasizes his inability to withstand the controlling influence Waters had over him and his overall gullibility and difficulty with understanding consequences. However, substantial evidence in the record supports the District Court's finding that Spell's developmental disability did not render him unable to appreciate his behavior or conform his conduct to the requirements of the law at the time of the offense.

¶31    At Spell's sentencing hearing, Dr. Beaver opined that Spell could appreciate the difference between right and wrong, but that he was unable to conform his conduct to the requirements of the law at the time of the offense. Dr. Beaver based his opinion on

12

Spell's intellectual disabilities, intoxication at the time of the crime, and his subservient relationship with Waters. Dr. Beavers testified that Waters influenced Spell's conduct more than Spell's intoxication did. However, during Spell's pre-sentence investigation, Spell was asked what reason he had for his involvement in Arnold's kidnapping and homicide. Spell responded in part by stating that Waters gave him "a lot of crack cocaine to smoke" and it made him lose control of his actions. Dr. Beaver acknowledged it was unusual that Spell did not mention Waters' influence over Spell or Spell's fear of Waters in his response.

¶32 Evidence in the record shows that Spell was able to withstand Waters' influence and threats. Spell was able to withstand Waters' directives during an attempt to kidnap a different woman prior to Arnold's kidnapping and murder. While at a gas station, Waters told Spell to put a woman in a sleeper hold and then into the truck. Spell told Tara Zody, a probation and parole officer with the Department of Corrections, that he purposely waited too long and the woman got in her car and left. Further, even though Spell alleges he was afraid of and threatened by Waters, Spell stayed with Waters for days after the incident. Spell could have gotten away from Waters earlier, when the two went to Walmart. While there, Spell did not ask for help from anyone or try to leave.

¶33 Although neither testified at the sentencing hearing, Dr. Hill and another doctor working for the State Hospital, Dr. Tim Casey, indicated in their initial report that Spell had the capacity to conform his behavior to the requirements of the law at the time of the offense. The report stated:

13

As noted above, we saw no evidence of mental disease or defect or developmental disability that included disorganized thoughts, confusion, severely intrusive delusions or hallucinations, or mood impairment. And we do not believe his intellectual disability was so incapacitating that he could not appreciate the wrongfulness of his behavior or consider alternatives other than the alleged directives of the co-defendant at the time of [the] crime.

¶34 The District Court did not abuse its discretion because evidence in the record supports its conclusion that Spell's intellectual disability did not prevent him from being able to appreciate his behavior and conform his conduct to the law. Although Spell's intellectual disability made him susceptible to Waters' influence, Spell knew his actions were wrong and he had the ability to stop himself from kidnapping and killing Arnold.

¶35 *3. Whether sentencing Michael Spell to prison violated his constitutional rights to be free from cruel and unusual punishments and to human dignity.*

¶36 The Eighth Amendment to the United States Constitution and Article II, Section 22 of the Montana Constitution prohibit the imposition of cruel and unusual punishments. Spell alleges his sentence to the Montana State Prison will subject him to cruel and unusual punishment because his intellectual disabilities make him susceptible to manipulation by others and because the "Montana State Prison has a history of not addressing the needs of those with disabilities."

¶37 There is no law to support Spell's assertion that an intellectually disabled person's right to be free from cruel and unusual punishment is violated by being sentenced to prison instead of committed to a treatment facility. Spell cites two decisions by this Court to support his argument: *Wilson v. State*, 2010 MT 278, 358 Mont. 438, 249 P.3d 28, and *Walker v. State*, 2003 MT 134, 316 Mont. 103, 68 P.3d 872. However, in those

cases, mentally ill inmates challenged the conditions of their confinement, not their actual sentence to prison. This Court did not hold that the mentally ill inmates' sentences were cruel and unusual punishment in either case. We also agree with the District Court that the holding in *Atkins v. U.S.* does not extend to protect an intellectually disabled defendant from being sentenced to prison. *Atkins* simply prohibits a court from sentencing an intellectually disabled defendant to death. *Atkins v. U.S.*, 536 U.S. 304, 321, 122 S. Ct. 2242, 2252 (2002). Spell's constitutional rights against cruel and unusual punishment were not violated by being sentenced to prison.

## CONCLUSION

¶38 Spell has not satisfied his burden to establish that he was incompetent when he made his guilty plea. Substantial evidence supports the District Court's competency finding. The District Court did not abuse its discretion when it found Spell appreciated his behavior and could conform his conduct to the law, and thus, the District Court was not required to sentence Spell to DPHHS. The District Court's decision to sentence Spell to prison did not subject him to cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution and Article II, Section 22 of the Montana Constitution.

¶39 Affirmed.

/S/ MIKE McGRATH

We Concur:

/S/ BETH BAKER
/S/ MICHAEL E WHEAT
/S/ LAURIE McKINNON
/S/ JIM RICE

15