Justice James Jeremiah Shea delivered the Opinion of the Court.
***74 ¶ 1 Defendant Coleton Christos Coburn appeals the sentence of the First Judicial District, Lewis and Clark County, sentencing him to the Montana State Prison (MSP) instead of committing him into the custody of the Montana Department of Health and Human Services (DPHHS).
¶ 2 We address the following issue on appeal:
Whether the District Court erred when it sentenced Coburn to prison and did not find that Coburn suffered from a mental disease, defect, or developmental disability that rendered him unable to appreciate the criminality of his behavior or to conform his behavior to the requirements of law.
We affirm.
***75 PROCEDURAL AND FACTUAL BACKGROUND
¶ 3 On July 12, 2015, two-year-old P.N. was in the care of Coburn while her mother, Coburn's girlfriend, worked. When she left for work, P.N.'s mother observed P.N. was "not injured and was behaving normally." Coburn's roommate, Marla George, also observed P.N. prior to leaving the house and testified P.N. appeared physically fine, though P.N.'s eyes were puffy and red, as if she had been crying.
¶ 4 At 7:19 p.m., Coburn called P.N.'s mother to tell her that P.N. had a seizure. P.N. was transported to St. Peter's Hospital and then life-flighted to Spokane, where she died the next day. Medical personnel identified seventy discrete injuries on P.N.'s body, including skull fractures, bruising, abdominal injuries, and injuries to the genitals. An autopsy was performed, and the medical examiner concluded the cause of P.N.'s death was non-accidental blunt force head trauma.
¶ 5 When questioned about what happened, Coburn repeatedly changed his story. He initially stated P.N. had a seizure; then he later told authorities P.N. had fallen while climbing on a pile of boxes; later still, Coburn said he blacked out and fell down stairs while holding P.N. A search of Coburn's home revealed physical evidence that P.N.'s injuries were consistent with the medical examiner's conclusions and inconsistent with any of Coburn's versions of events.
¶ 6 Coburn's behavior at the hospital was also erratic. When confronted by a doctor who questioned Coburn's story as inconsistent *245 with P.N.'s injuries, Coburn threatened to assault the doctor. While medical personnel attempted to revive P.N., Coburn stood nearby and placed a phone call. Coburn began yelling obscenities and was asked to leave. When he refused, a police officer forcibly escorted Coburn out and restrained him in a patrol car. When confronted by the fact that P.N. would likely not survive her injuries, Coburn told P.N.'s inconsolable mother not to be so upset because she would have another baby in a few months. Coburn admitted to drinking, smoking marijuana, and taking hydrocodone the day of P.N.'s death. Coburn's toxicology report showed a blood alcohol level of 0.06 and the presence of THC in his system.
¶ 7 On August 11, 2015, the State charged Coburn with Deliberate Homicide for causing P.N.'s death, Criminal Possession of Dangerous Drugs (marijuana), Criminal Possession of Drug Paraphernalia, and Obstructing a Peace Officer or Other Public Servant. On October 22, 2015, the State amended the Information to add the charge of Criminal Possession of Dangerous Drugs (methamphetamine). On December 18, ***76 2015, Coburn entered an Alford[1] plea to the charge of Deliberate Homicide.[2] Pursuant to the plea agreement, both the State and Coburn recommended a life sentence. Coburn argued that he should be sentenced to DPHHS custody, pursuant to § 46-14-311, MCA, rather than to MSP. Coburn retained Natalie Brown, Ph.D. to determine whether he suffered from a mental disorder at the time of his offense that prevented him from conforming his conduct to the law. After Coburn provided the State with a copy of Dr. Brown's report, the State moved, pursuant to § 46-14-311(2), MCA, for a pre-sentence investigation and mental health evaluation to be performed by DPHHS. The District Court granted the State's motion, and the State transported Coburn to the Montana State Hospital (MSH), where he was housed, observed, and evaluated for a ninety-day period.
¶ 8 Following the ninety-day observation, the District Court held sentencing hearings on June 23, 2016, and July 14, 2016. On June 23, 2016, Montana State Hospital Staff Psychiatrist. Virginia Hill, M.D., testified at Coburn's sentencing hearing. Dr. Hill testified that Coburn suffered from Fetal Alcohol Spectrum Disorder (FASD)[3] but opined that his FASD did not make him unable to conform to the law. Dr. Hill testified that, "[c]ertainly the etiology for some of Mr. Coburn's impulsive problems-the executive functioning problems-are related to his exposure to alcohol, cocaine, [and] cigarettes during utero."[4]
***77 Following observation of Coburn for ninety days at MSH, Dr. Hill, and the other medical personnel, confirmed additional diagnoses of ADHD, a number of substance abuse disorders, and antisocial personality disorder. However, Dr. Hill also concluded that Coburn is very high functioning. Dr. Hill testified that while Coburn's FASD contributed to the offense, she did "not think it was the primary factor in the tragedy that occurred. ... If there had not been drugs and alcohol on board, I don't think this would have happened. ... [b]ecause ... that kind *246 of behavior is not [Coburn's] usual daily response to stressors and crises." Dr. Hill concluded:
[B]ased on my interviews with Mr. Coburn, my reading of several other evaluators' assessment of type of crime behaviors, the court reports, I do not believe that the alcohol related neurodevelopmental disorder, or ADHD, symptoms were primarily responsible for what happened on that tragic night. ... I instead attribute the ... severe tragedy ... primarily to the alcohol and drug use.
¶ 9 Dr. Hill credited being clean and sober, as well as a successful pharmacological regimen, with Coburn's progress and good behavior at the time he was transferred from MSH to court custody. Dr. Hill concluded that, because Coburn is very high functioning, he does not require the inpatient level of care provided at MSH. Instead, Coburn's needs would be met at MSP via its outpatient services.
¶ 10 At the July 14, 2016 hearing, the District Court heard testimony from Coburn's expert, Dr. Brown. Dr. Brown testified that although FASD might manifest itself in different ways at different ages, FASD involves permanent, irreparable brain damage. FASD predicts poor social judgment, a lack of adaptive functioning, a lack of impulse control, telling lies, being sneaky, and a predisposition for substance abuse. Dr. Brown reviewed Coburn's juvenile and adult criminal history and his prior treatment program records and interviewed St. Peter's Hospital staff, Coburn's family and friends, his childhood therapist, and Coburn himself. Dr. Brown testified that Coburn's case was one of the most severe she and her team had encountered. Dr. Brown testified that although Coburn has a normal IQ, his executive functioning is so impaired that Dr. Brown likened him to an individual with an intellectual disability. Dr. Brown also testified that Coburn's FASD impairment led to the rage reaction and the battery that resulted in P.N.'s death. Dr. Brown described what a severe stress reaction would do to someone like Coburn:
[T]he primal brain highjack[s] the thinking brain. ... [Coburn's] got ... a medical and a mental defect that render him essentially ***78 equivalent to somebody with a psychotic condition who doesn't have control over their behavior. His lack of control doesn't stem from psychosis, however; it stems from biological brain impairment.
¶ 11 Dr. Brown disagreed with Dr. Hill's conclusion that drugs and alcohol were the primary contributing factor in the violent episode that caused P.N.'s death. Instead, Dr. Brown concluded that the records throughout Coburn's life "show similar out of control tantrumming [sic] rage reactions in situations when he wasn't using alcohol or drugs," and that Coburn's deficits "are driving the offense behavior, not the substance use." She opined that even absent the drugs and alcohol in Coburn's system, the likelihood of an event like the underlying offense occurring was the same. However, Dr. Brown conceded that it was likely that "the alcohol use before the offense had some kind of an additive impact or effect on his already impaired functioning." Dr. Brown's assessment was that Dr. Hill only observed Coburn in a limited environment: one with structure and one where he was on a successful, regimented medication schedule. Dr. Brown argued this potentially gave a false impression of Coburn's abilities to function in "the real world" or, more importantly, in the supervised, but far less structured, prison environment.
¶ 12 Dr. Brown concluded that, because of Coburn's FASD, he was mentally ill and unable at the time of the offense to appreciate the criminality of his actions or to conform his behavior within the requirements of the law. She also testified that, due to his mental illness, Coburn's behavior and needs could be better served at MSH rather than prison. Dr. Brown testified that the hospital setting would provide more structure and stability, which would help Coburn with medication management and behavioral guidance.
¶ 13 Probation Officer, and author of the pre-sentence investigation report, Gina Rasmussen, testified that Coburn's juvenile criminal history, beginning at age fourteen, was the "worst criminal juvenile record" she had ever seen. Rasmussen also testified regarding Coburn's experiences and behavior during *247 prior periods of incarceration at MSP, during which Coburn had been disciplined for "annoying behaviors" and for making threats and harassing other inmates. Rasmussen testified that Coburn told her he had started abusing alcohol at age twelve, when his parents divorced. It was around that time that Coburn's school performance deteriorated and his run-ins with the law began. Rasmussen concluded: "[Coburn] has a horrible history. Whether it's because of the FASD or an antisocial disorder, I'm going to leave that to the experts." ***79 ¶ 14 The District Court sentenced Coburn to life in prison with no parole restrictions and ordered him to register as a Tier II sexual offender. The District Court explained its decision was based primarily on expert testimony due to the lack of specific explanation regarding (1) what precisely occurred the night P.N. was beaten, and (2) the motivation behind the crime:
I think that it would help explain my decision by looking at some of the testimony that I took from Dr. Hill. ... And what Dr. Hill said ... that [Coburn] had comparatively high functioning in the hospital setting.
...
[O]bservation behavior provides the best example of a person's functioning. And ... [Dr. Hill] said ... Mr. Coburn ... was not randomly impulsive.
...
[Dr. Hill] thought [Coburn] was largely affected by alcohol and street drugs, which he was not while at the State Hospital. And that accounted to a large degree for his behavior both at the State Hospital and at the time of the offense.
...
Dr. Hill ... did not believe that the alcohol syndrome disorder or the alcohol related neurodevelopmental disorder were responsible for what happened. [Dr. Hill] attributed Mr. Coburn's behavior to alcohol and drug abuse. And she indicated that he's generally not a physically violent person. ... And that gets me to Ms. Rasmussen's comment on Mr. Coburn's juvenile history. Because she said he has the worst criminal history as a juvenile that she'd ever seen. And I would say it was the longest with the most incidents of bad behavior, but it wasn't violent behavior. And it wasn't predatory behavior.
...
Dr. Hill said that at the time of the offense ... Mr. Coburn was driven by poor judgment and disinhibition from alcohol, marijuana, and hydrocodone. ... [Dr. Hill] said that although [Coburn's] fetal alcohol was a contributing factor, it wasn't the primary factor.
...
On the whole, [Dr. Hill] said [Coburn] was a high functioning patient. And [Dr. Hill] said that [Coburn's] mental health needs could readily be met on an outpatient basis. ... [T]he State Prison provides stability and structure that [Coburn] needs.
...
***80 I haven't heard much in the way of testimony as to what happened precisely at the time of the crime that prevented [Coburn] from being able to conform, other than what has been a life history of impulsive behavior because of his fetal alcohol syndrome disorder and the alcohol related neurodevelopmental disorder. ... And I don't think that the testimony from the defense was definitive enough for me to make a finding that at the time of the commission, [Coburn] met the criteria for mental disease or disorder defense. And so for that reason, he's going to be sentenced to the Montana State Prison.
...
[G]iven the testimony of Dr. Brown ... that the prognosis for somebody with [Coburn's] diagnosis over time is that they are amen[able] to treatment and that they are amen[able] to change and that their behavior can be modified over a length of time. ... it gives him the opportunity ... to demonstrate that he's not a danger to society, that he's taken responsibility for his actions ....
¶ 15 In its oral pronouncement, the District Court also discussed Coburn's extensive juvenile criminal history, Coburn's conduct before and after the offense, and the need for justice for P.N.'s mother. The judgment was *248 finalized on August 8, 2016. In its written judgment, the District Court justified its decision based on the "pre-sentence investigation report, the [expert] evaluations, the testimony and evidence presented, and the fact that [Coburn] caused the death of a human being, two-year old P.N." Coburn appeals.
STANDARDS OF REVIEW
¶ 16 We review a criminal sentence for legality. State v. Scarborough , 2000 MT 301, ¶ 90, 302 Mont. 350, 14 P.3d 1202. We review for abuse of discretion a district court's determination of the existence of a mental disease or defect under § 46-14-311, MCA. State v. Spell , 2017 MT 266, ¶ 17, 389 Mont. 172, 404 P.3d 725 (citing State v. Gallmeier , 2009 MT 68, ¶ 11, 349 Mont. 424, 203 P.3d 852 ); State v. Collier , 277 Mont. 46, 60, 919 P.2d 376, 385 (1996). A district court abuses its discretion when it acts arbitrarily without employment of conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice. State v. Burke , 2005 MT 250, ¶ 11, 329 Mont. 1, 122 P.3d 427 (citing State v. Weldele , 2003 MT 117, ¶ 72, 315 Mont. 452, 69 P.3d 1162 ).
DISCUSSION
¶ 17 Whether the District Court erred when it sentenced Coburn to ***81 prison and did not find that Coburn suffered from a mental disease, defect, or developmental disability that rendered him unable to appreciate the criminality of his behavior or to conform his behavior to the requirements of law.
¶ 18 Pursuant to § 46-14-311, MCA, a sentencing court must consider "a defendant's mental condition whenever a defendant claims that [he] suffered from a mental disease[,] defect, [or disability] at the time of the commission of the offense" such that he was unable to appreciate the criminality of his behavior or to conform his behavior to the requirements of law. Gallmeier , ¶ 13 (internal citations omitted); Spell , ¶ 29 (quoting § 46-14-311(1), (2), MCA ); State v. Korell , 213 Mont. 316, 333, 690 P.2d 992, 1001 (1984) (citing § 46-14-311, MCA ). To properly consider a defendant's mental condition, the sentencing court must order a pre-sentence investigation and a report on the investigation. Section 46-14-311(2), MCA. The investigation must include a mental evaluation by DPHHS-appointed personnel with an opinion as to whether the defendant suffered from a mental disease or disorder or a developmental disability. Section 46-14-311(2), MCA. The sentencing court must also utilize "any relevant evidence that it considers necessary to determine if the mental disease or defect "rendered the defendant unable to appreciate the criminality of the defendant's behavior or to conform the defendant's behavior to the requirements of law ...." Section 46-14-311, MCA ; Gallmeier , ¶ 13 ; State v. Raty , 214 Mont. 114, 118-19, 692 P.2d 17, 19-20 (1984) ; Burke , ¶¶ 6, 13, 17, 21 (affirming a district court's sentence of four years in prison for a defendant with a diagnoses of antisocial personality disorder, borderline intellectual functioning, bipolar disorder with psychotic features, and ADHD where the district court found that defendant's mental condition did not render him unable to appreciate the criminality of his behavior or to conform his behavior to the requirements of law). The sentencing court has a basic duty "to independently evaluate the defendant's mental condition," and the record "must reflect the deliberative process." Korell , 213 Mont. at 338-39, 690 P.2d at 1004 (vacating a defendant's sentence and remanding where a district court deferred completely to the jury's decision and failed to independently evaluate the defendant's mental condition).
¶ 19 A defendant has the burden of proving he suffered from a developmental disability or mental disease or disorder at the time of the offense such that he was unable to appreciate the criminality of his behavior or to conform his behavior to the requirements of law. Gallmeier , ¶ 13 ;
***82 State v. Rathbun , 2003 MT 210, ¶ 15, 317 Mont. 66, 75 P.3d 334 ; State v. Watson , 211 Mont. 401, 416-17, 419-20, 686 P.2d 879, 886-89 (1984) (affirming a district court's sentence of imprisonment after the district court determined that although the defendant suffered from a mental illness, that mental disease did not satisfy the requirements of § 46-14-311, MCA, and the defendant was not relieved of criminal liability). If a defendant satisfies all *249 the requirements of § 46-14-311, MCA, the sentencing court must sentence the defendant to DPHHS custody. Raty , 214 Mont. at 118-19, 692 P.2d at 19-20. We will not disturb a district court's conclusion regarding a defendant's mental disease or defect, unless the conclusion is unsupported by the record. Gallmeier , ¶ 20 (citing State v. Pittman , 2005 MT 70, ¶ 42, 326 Mont. 324, 109 P.3d 237 ).
¶ 20 We previously held that a district court did not abuse its discretion when it sentenced a defendant to prison, rather than to DPHHS, after considering the record including the pre-sentence investigation, multiple psychological reports, DPHHS competency reports, and both parties' memoranda. Gallmeier , ¶¶ 17, 20 (citing Korell , 213 Mont. at 338, 690 P.2d at 1004 ). In Gallmeier , the defendant's expert testified the defendant "probably" suffered from a mental defect at the time of the offense but could only speculate as to whether the defendant appreciated the criminality of her behavior. Gallmeier , ¶ 18. The district court determined that the defendant did not meet her burden of proof that she suffered from the type of mental disease or defect contemplated by § 46-14-311, MCA. Gallmeier , ¶ 20 (citing Rathbun , ¶¶ 12, 15, 21 ) (affirming a district court sentence to MSP instead of DPHHS after a district court sufficiently explained its sentence pronouncement). In another case, we held that a district court did not abuse its discretion when it concluded that, despite a defendant's intellectual disability, the defendant was able to appreciate his behavior, consider alternatives, and conform his conduct to law. Spell , ¶¶ 33-34. In Spell , the district court relied heavily on the State expert's report and concluded the defendant knew his actions were wrong, and he had the ability to stop himself from kidnapping and killing the victim at his co-defendant's direction. Spell , ¶¶ 33-34.
¶ 21 Conversely, this Court remanded a case for resentencing after determining the record failed to demonstrate that the district court fulfilled its obligation to independently evaluate the defendant's mental condition. Raty , 214 Mont. at 119, 692 P.2d at 20. After a request from the defendant to consider sentencing him to DPHHS custody, the district court did not evaluate the defendant's mental condition and made no finding whatsoever as to whether the defendant was suffering from a mental disease or defect that rendered him ***83 unable to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. Raty , 214 Mont. at 119, 692 P.2d at 20 (citing § 46-14-311, MCA ).
¶ 22 Coburn argues the District Court abused its discretion when it ignored Dr. Brown's testimony, required Coburn to provide a specific explanation for the offense, erroneously determined that Coburn did not satisfy the criteria for mental disease, disorder, or developmental disability pursuant to § 46-14-311, MCA, and sentenced him to MSP instead of DPHHS custody. Coburn further argues that undisputed evidence exists and supports the determination that he suffers from a mental disability attributable to his mother's in-utero alcohol consumption. While trying to supervise a two-year-old child, Coburn argues, his FASD caused his executive functioning to shut down such that he was unable to conform his conduct to the requirements of law.
¶ 23 The State counters that, contrary to Coburn's suggestion, the District Court's oral ruling evinces consideration of all the evidence presented. The State argues that the District Court properly concluded that Coburn did not meet his burden of proving to the District Court's satisfaction that he was suffering from a mental disease or disorder that rendered him unable to conform his conduct to the requirements of the law when he beat P.N. to death. Thus, the State contends, the District Court's decision was supported by evidence in the record and was not an abuse of discretion. We agree.
¶ 24 Upon Coburn's request, the District Court followed the proper procedures to investigate Coburn's mental condition, as required by statute. See § 46-14-311, MCA. The District Court independently evaluated Coburn's mental condition and considered the evidence presented by both parties. See Gallmeier , ¶ 20. In its oral pronouncement and written judgment, the District Court set forth its rationale for Coburn's sentence, and explained its deliberative process. See *250 Gallmeier , ¶ 20. The District Court evaluated both experts' testimony, Probation Officer Rasmussen's testimony, Coburn's medical and criminal history, Coburn's conduct before and after the offense, the fact that Coburn changed his story numerous times, his callous treatment of his girlfriend, P.N.'s mother, and the severity of his crime. The record establishes that the District Court considered the evidence before it and deliberated the merits of Coburn's case. See contra Korell , 213 Mont. at 338-39, 690 P.2d at 1004.
¶ 25 The record further establishes that Coburn did not meet his burden of proving to the District Court that he suffered from the type of mental disease or defect as defined in § 46-14-311, MCA. See Gallmeier , ¶ 20 ; Rathbun , ¶ 15. Coburn failed to present any evidence ***84 regarding the circumstances of the offense and did not provide any information along those lines to his own expert, Dr. Brown. Dr. Brown's opinion regarding the cause of Coburn's behavior on the night of the offense was based on nothing more than her interpretation about the known facts from that night and conjecture about what else may have occurred. Suffering from a mental disease, defect, or disability is not, on its own, sufficient to relieve Coburn of his criminal liability. See Gallmeier , ¶ 13. Based on the evidence Coburn presented, the District Court was unable to make the requisite factual finding that Coburn's mental disease, defect, or disability at the time of the commission of the offense made him unable to appreciate his behavior or to conform his conduct to the requirements of law. See § 46-14-311, MCA ; see also Spell , ¶¶ 29, 34. The District Court's decision to sentence Coburn to MSP instead of into DPHHS custody is supported by the record, and we will not disturb this conclusion. See Gallmeier , ¶ 20.
CONCLUSION
¶ 26 The District Court did not abuse its discretion when it sentenced Coburn to MSP rather than to DPHHS custody. We affirm.
We Concur:
MIKE McGRATH, C.J.
INGRID GUSTAFSON, J.
DIRK M. SANDEFUR, J.
JIM RICE, J.

In an Alford plea, a defendant does not admit to the criminal act and asserts innocence while acknowledging prosecutors have enough evidence to secure a conviction. North Carolina v. Alford , 400 U.S. 25, 37, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).

As part of the plea agreement, the State dismissed all other counts against Coburn.

FASD is an umbrella term encompassing several conditions including fetal alcohol syndrome (FAS), partial FAS, and alcohol related neurodevelopmental disorder (ARND). Both Dr. Hill and Dr. Brown testified that the current Diagnostic and Statistical Manual of Mental Disorders (DSM-5) contains a new FASD mental health diagnosis: neurodevelopmental disorder associated with prenatal alcohol exposure (NDPAE). Coburn's official diagnosis is ARND.

Both Dr. Hill and Dr. Brown testified regarding Coburn's background: At age five, Coburn was diagnosed with ADHD, and, at age fifteen, Coburn was referred to Dr. Mary Kay Bogumill, who conducted extensive testing and confirmed Coburn's fetal alcohol exposure diagnosis. Both experts relied on Dr. Bogumill's report, which concluded Coburn's behavioral problems stemmed from a combination of "interpersonal stressors," including growing up in a "rather chaotic home in that parents were frequently fighting and mother was frequently visibly intoxicated," his parents' divorce, his FASD, and his ADHD.