FILED

08/19/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 22-0662

DA 22-0662

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 183

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

LLOYD MORTIER BARRUS,

      Defendant and Appellant.

APPEAL FROM:   District Court of the First Judicial District,
In and For the County of Broadwater, Cause No. CDC-2017-15
Honorable Kathy Seeley, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      Colin M. Stephens, Stephens Brooke, P.C., Missoula, Montana

      For Appellee:

      Austin Knudsen, Montana Attorney General, Roy Brown, Assistant
Attorney General, Helena, Montana

      Kevin Bratcher, Broadwater County Attorney, Daniel Guzynski,
Stephanie Robles, Special Deputy County Attorneys, Townsend,
Montana

              Submitted on Briefs:  June 11, 2025

                  Decided:  August 19, 2025

Filed:

                            _____
                                 Clerk

Justice Laurie McKinnon delivered the Opinion of the court

¶1      Lloyd Mortier Barrus (Barrus) appeals from the March 15, 2022 Findings of Fact, Conclusions of Law, and Order on Sentencing (Order) entered in the First Judicial District Court, Broadwater County, which sentenced him to the custody of the Department of Corrections (DOC) instead of to the Department of Public Health and Human Services (DPHHS).

¶2      Barrus presents the following issue for review:

*Whether the District Court abused its discretion by sentencing Barrus to DOC custody instead of DPHHS custody.*

### FACTUAL AND PROCEDURAL BACKGROUND

**Barrus's Background**

¶3      In 2000, Barrus and one of his sons, Jeffrey, engaged in a shootout, high-speed vehicle chase, and armed standoff with law enforcement in the Mojave Desert. Both eventually surrendered and were charged with multiple felonies. Barrus was found unfit to proceed to trial and diagnosed with Delusional Disorder. After the California court ordered him to take antipsychotic medications, Barrus was eventually found fit to proceed. He pleaded guilty pursuant to a plea agreement and was incarcerated in California from 2002 until January 2013, when he was released on parole until the expiration of his sentence in January 2016. Barrus maintained a clean criminal record from the expiration of his parole until May 2017, when he was charged in the instant case.

¶4      Barrus's other son, Marshall, relocated to Montana from Minnesota in 2016 with his five children and their mother, Tara. He struggled to find stable employment and

2

housing, and was also awaiting trial on an unrelated felony burglary charge. In May 2017, Barrus drove to Montana from his home in California to help Marshall find work in the construction trade. Barrus stayed with the family[1] at a campground near Canyon Ferry, Montana, for about a week.

¶5 Tara would later report that Marshall's anxiety and paranoia increased after Barrus arrived. The father and son spent significant time at the campground sitting together in Barrus's Suburban and listening to "antigovernment talk shows" on the radio. On approximately May 14, Barrus encouraged and shamed his son into drinking alcohol with him, despite Marshall's pretrial conditions requiring he abstain from alcohol. On May 15, Barrus and Marshall left the campsite to travel to Gallatin County, Montana, in an effort to obtain licensing for a hardwood flooring business. They returned inebriated to camp that evening. Marshall proceeded to drink Tara's bottle of wine while continuing to listen to talk radio with Barrus. Tara drove Marshall into Townsend, Montana, to acquire more alcohol.

¶6 Now, alone at the campsite with his grandchildren, Barrus spoke with one, telling her she "was born into the militia" with "no way out of it[,]" she would "make a great lady sniper[,]" and his belief that "all police should be hung[.]" He further warned her against the "brainwashing" efforts of her schoolteachers. The grandchild would testify that Barrus spent his time at the campsite listening to music and reading the Bible.

---

[1] Only three of Marshall's children were present at the campsite. His older two children lived independently elsewhere in Montana.

¶7	When Marshall and Tara returned, they remained in their vehicle listening to "love music." Tara realized later that this was Marshall's attempt to say goodbye. Marshall asked his family to travel with him and his father to California. The family declined. Marshall removed his SCRAM unit, which he wore to detect alcohol consumption as a condition of his pretrial release, from his ankle and gave it to Tara. Barrus inspected Tara's phone and instructed her to delete "incriminating" text messages, which she did without understanding why. Barrus laughed and waved Marshall's 9 mm Glock handgun at Tara from the driver's seat of his Suburban. He claimed the two were about to embark on a "suicide mission" and warned her that, if she joined, she would "get killed." Barrus gave Tara a signed and dated copy of his manifesto, "We the People or Them the Government[,]" before driving himself and Marshall away from the campsite late on May 15, 2017. Alarmed by Marshall and Barrus's behavior, Tara texted Marshall asking what Barrus meant by the statements "if we go, we die[?]" She moved the children into her vehicle and locked the doors.

¶8	Barrus and Marshall travelled into Townsend, to purchase beer and gasoline after midnight on May 16, 2017. The two returned to the campsite around 1:00 a.m. to retrieve extra ammunition and other belongings. Marshall fired his .308 caliber M1A rifle into the firepit at the campsite to get the attention of his family when he did not find them in their tent. Discovering his family in Tara's vehicle, Marshall broke a rear window of the car with his elbow, injuring his son inside. For the last time, Marshall then asked his family to come with him to California. They declined.

4

¶9 Leaving the campsite for good, the two returned to the gas station in Townsend shortly after 2:13 a.m. and from there headed South towards Three Forks, Montana. North of Three Forks, the Suburban passed the patrol vehicle of Broadwater County Deputy Sherrif Mason Moore (Deputy Moore) at a high-rate of speed. Deputy Moore activated his lights and siren and began pursuing the Suburban. Barrus did not slow down and continued driving, prompting Deputy Moore to alert dispatch that he was in pursuit of a vehicle traveling faster than 100-mph.

¶10 When Barrus eventually slowed down, he seemingly did so to allow Deputy Moore to come into range of Marshall's rifle. From the rear of the Suburban, Marshall began firing at Deputy Moore's vehicle. At least one struck Deputy Moore, wounding him in the face and causing him to lose control of his patrol vehicle. His vehicle came to a stop off the highway. Barrus continued driving south. Deputy Moore's dashcam recorded three minutes of his labored breathing, his removal of his seatbelt, and his attempt to exit his vehicle by opening the driver's side door. Dashcam footage then captured the bright light of the Suburban's headlights returning, followed by a quick succession of rifle fire striking the vehicle and Deputy Moore. The audio recording captured Marshall yelling as the Suburban then fled the scene.

¶11 Dispatch issued an alert after losing contact with Deputy Moore. The responding trooper found the patrol vehicle and radioed for medical assistance for a severely wounded Deputy Moore. The trooper also found tire tracks and .308 caliber casings. Deputy Moore was pronounced dead at the scene.

¶12 Barrus drove west, eventually being spotted exceeding 100-mph near Butte, Montana. Two Butte officers began pursuing Barrus's vehicle, continuing across Anaconda-Deer Lodge, Powell, and Granite Counties. More officers from various jurisdictions joined the chase. Despite losing his tires to stop sticks near Drummond, Montana, Barrus continued driving at speeds up to 70-mph on his rims. Barrus remained sufficiently in control of the vehicle to provide Marshall with a stable driving line from which he could accurately direct fire at the police vehicles on their trail. Police spotlights revealed Marshall moving between passenger seats within the vehicle before he reassumed a shooting position in the rear of the Suburban. Marshall was able to disable the two lead Butte police chase vehicles with his M1A.

¶13 Approximately 120 miles from where Deputy Moore died, Barrus stopped the Suburban on the side of Interstate 90 west of Drummond. Marshall exited from the passenger side and continued to fire his M1A at officers. Barrus fired his Glock at officers from the driver's side of the Suburban. Return fire from law enforcement wounded Barrus's finger and damaged the firearm, frustrating his ability to return fire. Marshall continued to shoot from the side of the Suburban until officers shot him. With father and son unable to return fire, the shooting stopped.

¶14 Barrus emerged from his vehicle and threw his Glock away. Ignoring officers' demands to show his hands, Barrus walked to the passenger side of the Suburban and found Marshall dying from a gunshot wound to the head. He would later claim he considered picking up Marshall's rifle. Instead, Barrus surrendered.

¶15 Upon his arrest, Barrus referred to himself as "just evil fucking militia" and asked arresting officers to "fucking please execute me instead of taking me to jail." He complied with officers' instructions and acquiesced to a patdown, which revealed an additional Glock magazine in his pocket. He also complimented law enforcement on his capture, saying "You guys did good" and "I've never met nicer cops in my whole life."

¶16 While being transported to the hospital to treat the bullet wound to his finger, Barrus continued to talk to the deputy driving him. He expressed his "honor" at being apprehended by Montana law enforcement. Barrus hoped the State would simply hang him "like the old vigilantes[,]" due to his aversion to "getting locked up." Arrest seemed surprising for Barrus, who claimed he intended "a suicide-by-cop situation." Once released from the hospital and transported to jail, Barrus asked the deputy, "Why don't you guys shoot people anymore?" He said he desired a summary hanging, rather than a prison sentence "hang[ing] around a bunch of goddamn criminals."

¶17 The State charged Barrus with, as relevant here, one count of Deliberate Homicide by Accountability for the death of Deputy Moore as well as two counts of Attempted Deliberate Homicide by Accountability for the two Butte police vehicles disabled by Marshall's rifle fire.

**Barrus's Fitness to Proceed to Trial**

¶18 Dr. Virginia Hill (Dr. Hill), staff psychiatrist, and Dr. Timothy Casey (Dr. Casey), staff psychologist, at Montana State Hospital (MSH) evaluated Barrus in December 2017 and found him unfit to proceed to trial due to a mental disorder. *Barrus v. Montana First*

7

*Jud. Dist. Ct.*, 2020 MT 14, ¶ 3, 398 Mont. 353, 456 P.3d 577. Dr. Hill and Dr. Casey diagnosed Barrus with "Delusional Disorder, Persecutory Type; Mixed Personality Disorder with Antisocial and Narcissistic Features; Alcohol Use Disorder; Cannabis Use Disorder; Hypertensions; and Low Vitamin D Level." *Barrus*, ¶ 3. To render Barrus fit for trial, Dr. Hill developed a treatment plan which, in part, prescribed the use of antipsychotic medications, including the same medication which restored his fitness to proceed to trial in the Mojave Desert trial. *Barrus*, ¶ 5. Barrus refused to comply with the plan. *Barrus*, ¶ 5.

¶19    The District Court held five days of evidentiary hearings between December 2018 and January 2019 on the State's motion to compel Barrus's compliance with the treatment plan in accordance with *Sell v. United States*, 539 U.S. 166, 123 S. Ct. 2174 (2003). The State presented testimony in favor of forced medication from Dr. Hill and Dr. Alan Newman (Dr. Newman); Barrus presented testimony in opposition from Dr. C. Robert Cloninger (Dr. Cloninger). *Barrus*, ¶ 7. On May 1, 2019, the District Court agreed with the State and ordered Barrus comply with the treatment plan or face involuntary medication. *Barrus*, ¶ 8.[2] After Barrus was treated, the District Court deemed Barrus fit to stand trial on September 15, 2020. The trial began nearly one year later on September 7, 2021.

---

[2] This Court affirmed the District Court's Order after Barrus sought a writ of supervisory control. *Barrus*, ¶¶ 1, 42.

**Sentencing**

¶20 The jury returned its verdict on September 21, 2021, convicting Barrus on the single count of Deliberate Homicide by Accountability and the two counts of Attempted Deliberate Homicide by Accountability. While Barrus never intended to offer evidence that his mental disease or disorder prevented the particular mental state element of the crimes charged, he did file a notice of intent to rely on § 46-14-311, MCA, if convicted. Pursuant to § 46-14-311, MCA, the court held a bifurcated evidentiary hearing on January 21 and 24, 2022, to determine whether Barrus was suffering from "a mental disease or disorder that rendered him unable to appreciate the criminality of his behavior or to conform his behavior to the requirements of the law[.]" Section 46-14-311(1), MCA.

¶21 Dr. Hill and Dr. Newman submitted their reports to the court and testified. Both doctors agreed Barrus suffers from a mental defect or disorder but disagreed as to whether this prevented him from appreciating the criminality of his behavior or conform his behavior to the law.

¶22 Based on her treatment of Barrus at MSH since at least 2018, Dr. Hill believed he met the criteria under § 46-14-311, MCA, because, while Barrus may have known his actions on May 16, 2017, were criminal, he could not appreciate the criminality of that conduct. She further believed that his ability to conform his behavior to the law was impaired. In his conversations with MSH medical staff, Barrus said the May 16, 2017 events would not have happened if he had stayed in California. He claimed Marshall "pleaded" for Barrus to return the Suburban to where Deputy Moore crashed to avoid an

9

attempted murder charge by killing the officer and thus eliminating a witness. Marshall preferred death to possible incarceration. Throughout his interactions with Dr. Hill and MSH evaluators, Barrus denied having a mental illness. While the earlier reports created by Dr. Hill and staff assessing Barrus's capacity in preparation for trial concluded "Barrus is believed to have had the capacity to have acted with knowledge and purpose at the time of the crimes[,]" Dr. Hill's report for the sentencing court concluded "Barrus suffered from fixed, persecutory delusions that government officials, including police officers, were monitoring, harassing, and malevolently treating himself and [Marshall]." These delusions manifested in a disbelief law enforcement would continue following him across county lines and a belief that Deputy Moore was "acting aggressive[.]" Barrus believed "his behaviors at the time of the crimes were necessary for self-defense." Thus, Dr. Hill opined that Barrus's "chronic and untreated persecutory delusions, amplified by lifestyle stressors and possible use of alcohol and marijuana, likely impaired his ability to appreciate the criminality of his conduct and his ability to conform his conduct to the requirement of the law." In Dr. Hill's opinion, Barrus met the requirements for DPHHS custody under § 46-14-311, MCA.

¶23 Dr. Newman, on the other hand, believed that Barrus's delusional disorder was not the cause of his crimes. Barrus voluntarily consumed alcohol prior to the events of May 16, 2017, despite knowing Marshall's paranoia and how alcohol only increased that paranoia. His resulting voluntary intoxication was a precipitating factor in his actions. Barrus had stated his primary motive for beginning the high-speed chase "was to avoid capture" for

driving under the influence as well as to protect Marshall from arrest for violating the condition of his pretrial release. Dr. Newman posited Barrus's aversion to detention by law enforcement is "strong evidence that a defendant is aware of the criminality of his conduct." Moreover, Barrus's eventual surrender and the statements he made in the aftermath of his arrest evinced Barrus's awareness he was surrendering to law enforcement, was under arrest, and why he was being taken into custody. That Barrus surrendered after he knew Marshall had been incapacitated demonstrated a capacity to cease his criminal activity to instead focus his concerns for his wounded son despite his impulsive behavior. An expressed desire for execution provided "strong evidence" of Barrus's awareness not only of having engaged in illegal acts but the protracted legal consequences—including a potential death sentence—were realistically probable consequences.

¶24 The District Court reviewed evidence and testimony from the expert witnesses and considered the evidence presented at the trial. In weighing the competing expert reports, the District Court found Dr. Newman more persuasive when viewed in light of the evidence presented at trial. The court also noted that Dr. Newman's evaluation, unlike Dr. Hill's, was "not clouded by a long-term doctor/patient relationship." The District Court found Barrus's anti-government sentiments, expressed through his manifesto and exacerbated by his media consumption habits, were "not delusional in and of themselves." Ultimately, the District Court concluded that Barrus appreciated the criminality of his actions on May 16, 2017, based upon his awareness of the events transpiring as he participated in them, his lack of a delusional explanation for doing so, and his behavior during their flight from the

11

scene of Deputy Moore's murder. The court recognized Barrus's feelings of doom as "a reasonable reaction to participation in the homicide of a law enforcement officer and the flight thereafter."

¶25 On April 22, 2022, the court sentenced Barrus to DOC custody for three life sentences without the possibility of parole. Barrus now appeals.

## STANDARD OF REVIEW

¶26 We review a criminal sentence for legality. *State v. Coburn*, 2018 MT 246, ¶ 16, 393 Mont. 73, 428 P.3d 243 (citation omitted). We review a district court's determination of a mental disease or disorder under § 46-14-311, MCA, for abuse of discretion. *Coburn*, ¶ 16 (citing *State v. Spell*, 2017 MT 266, ¶ 17, 389 Mont. 172, 404 P.3d 725; *State v. Gallmeier*, 2009 MT 68, ¶ 11, 349 Mont. 424, 203 P.3d 852; *State v. Collier*, 277 Mont. 46, 60, 919 P.2d 376, 385 (1996)). A district court abuses its discretion when it acts arbitrarily without employment of conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice. *Coburn*, ¶ 16 (citation omitted).

## DISCUSSION

¶27 Pursuant to § 46-14-311, MCA, a sentencing court must determine whether, at the time of the offense, the defendant was suffering from a mental disease or disorder that rendered them "unable to appreciate the criminality of [their] behavior or to conform [their] behavior to the requirements of law." Section 46-14-311(1), MCA; *Coburn*, ¶ 18 (citations omitted). This language establishes a post-conviction inquiry distinct from the question of mens rea during the guilt/innocence phase of trial. Because the defendant has already been

12

found guilty beyond a reasonable doubt, the § 46-14-311, MCA, inquiry presumes the defendant acted "knowingly" or "purposely" within the meaning of § 45-2-101(35), MCA. Thus, to hold "appreciate the criminality" is synonymous with "knowingly" would collapse the post-conviction standard into the mens rea standard, and render § 46-14-311, MCA, a nullity. The Legislature could have used the phrase "knowingly" in § 46-14-311, MCA, but chose instead to use "appreciate." We note that § 46-14-311, MCA, was enacted as part of a broader reform in 1979 that abolished the traditional insanity defense while preserving a narrow post-conviction inquiry into a defendant's mental condition at the time of the offense. During legislative hearings, Senator Tom Towe explained that the provision was intended to reach defendants who "did something wrong [and] intended to do it, but . . . thought what [they] did was not criminal." *Hearing on H.B. 877 before the S. Jud. Comm.*, 44th Leg., Reg. Sess. 5 (Mont. 1979). Thus, the Legislature intended to distinguish "appreciation" from mere awareness of conduct and to require courts to assess whether a mental disease or defect impaired a defendant's ability to fully comprehend the criminality of their actions at the time of the commission of the offense. The purpose of the statute is to account for the diminished capacity of individuals who, although legally culpable, lacked the mental and emotional faculties to fully grasp the criminality of their behavior. This statutory distinction must be preserved. The inquiry pursuant to § 46-14-311, MCA, therefore, is whether, though Barrus acted knowingly when he committed the crime as the jury determined, he appreciated and fully comprehended the criminality of his actions. To the extent courts are asked to assess mental condition under § 46-14-311, MCA, they must

13

evaluate "appreciate" as whether the defendant understood what he was doing was wrong under the law—a different standard then whether the defendant acted "knowingly."

¶28   To properly consider a defendant's mental condition, the sentencing court must order a presentence investigation report, including a mental evaluation by DPHHS-appointed personnel with an opinion as to whether the defendant suffered from a mental disease or disorder or a developmental disability. *Coburn*, ¶ 18 (citing § 46-14-311(2), MCA). Section 46-14-311, MCA, further provides that the sentencing court must also utilize any relevant evidence it considers necessary to determine if the mental disease or defect rendered the defendant unable to appreciate the criminality of his behavior or to conform his behavior to the requirements of the law. *Coburn*, ¶ 18 (citations omitted). The sentencing court bears a fundamental duty to independently evaluate the defendant's mental condition and the record must reflect the court's deliberative process. *Coburn*, ¶ 18 (citing *State v. Korell*, 213 Mont. 316, 338-39, 690 P.2d 992, 1004 (1984)).

¶29   Should the court find the defendant did not suffer from a mental disease or disorder as described in § 46-14-311, MCA, the court shall sentence the defendant as provided for in Title 46, chapter 18, MCA, under Montana's general sentencing statutes. Section 46-14-312(1), MCA. The defendant has the burden of proving he suffered from a developmental disability or mental defect or disorder at the time of the offense which rendered him unable to appreciate the criminality of his behavior or to conform his behavior to the requirements of the law. *Coburn*, ¶ 19 (citations omitted). If the defendant

satisfies the requirements provided for in § 46-14-311, MCA, must the sentencing court sentence him to DPHHS custody. [?] *Coburn*, ¶ 19.

¶30 A district court does not abuse its discretion by sentencing a defendant to DOC custody rather than to DPHHS when the court follows the mandates of § 46-14-311, MCA, to review the record, including the pre-sentence investigation, reports from psychological evaluations, DPHHS competency reports, and the memoranda of both parties, before rendering its decision. *Coburn*, ¶ 20; *Gallmeier*, ¶¶ 17, 20; *Spell*, ¶ 34. Conversely, a district court abuses its discretion if the record fails to demonstrate that the court fulfilled its obligation to independently evaluate the defendant's mental condition. *State v. Raty*, 214 Mont. 114, 119, 692 P.2d 17, 20 (1984); *Korell*, 213 Mont. at 338-39, 690 P.2d at 1004; *State v. Watson*, 211 Mont. 401, 419-20, 686 P.2d 879, 888-89 (1984); *State v. Doney*, 194 Mont. 22, 36-37, 636 P.2d 1377, 1386 (1981).

¶31 In *Coburn*, the defendant did not present sufficient evidence to meet his burden of proof that his "mental disease, defect, or disability at the time of the commission of the offense made him unable to appreciate his behavior or to conform his conduct to the requirements of the law." *Coburn*, ¶ 25 (citing § 46-14-311, MCA; *Spell*, ¶¶ 29, 34). Satisfied the court complied with the requirements of § 46-14-311, MCA, we affirmed the district court's order on sentencing because the court had "set forth its rationale for Coburn's sentence, and explained its deliberative process" after considering the record as a whole. *Coburn*, ¶ 24 (citing *Gallmeier*, ¶ 20). Likewise, the *Gallmeier* Court affirmed a sentence to DOC custody where the District Court articulated on the record its "reasons for

15

the sentence," taking into account the defendant's mental condition, exemplified chiefly by her actions before and after the crime, and following consideration of "the appropriate statutory factors." *Gallmeier*, ¶¶ 19-20 (citations omitted).

¶32 Barrus argues that he suffered from a mental disorder at the time of the offense that rendered him unable to appreciate the criminality of his conduct or conform his behavior to the requirements of the law. His argument turns on the competing opinions of Dr. Newman and Dr. Hill. Specifically, he alleges the District Court abused its discretion by failing to adopt Dr. Hill's opinion that he qualified for DPHHS custody under § 46-14-311, MCA.

¶33 Here, substantial evidence in the record supports the District Court's conclusion that Barrus's mental disorder did not render him unable to appreciate his behavior or conform his conduct to the requirements of the law at the time of the offense. Upon Barrus's request, the District Court held a bifurcated evidentiary hearing to consider whether § 46-14-311, MCA, applied to his case. The District Court independently evaluated Barrus's mental condition and considered the reports and testimony of the parties' expert witnesses, as well as the trial record including the *Sell* hearing. The Order detailed the court's rationale, describing Barrus's conduct preceding his departure from the campground with Marshall, during his flight from law enforcement before and after Marshall killed Deputy Moore, and his behavior after his arrest in the early hours of May 16, 2017. Given the conflicting expert opinions of Dr. Newman and Dr. Hill, the District Court adequately weighed these evaluations; Dr. Newman's report and testimony proved more convincing than Dr. Hill's

conclusions regarding Barrus's ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law in light of his Delusional Disorder and paranoia. The District Court explained that Dr. Hill's evaluation appeared "clouded by a long-term relationship"; a conclusion that is supported by the evidence that during the *Sell* hearing Dr. Hill believed Barrus could appreciate the criminality of his behavior, an opinion that changed during the § 46-14-311, MCA, hearing. Because an assessment of testimony is best made upon observation of the witness's demeanor and consideration of other intangibles that are only evident during live testimony, *Ford v. Sentry Cas. Co.*, 2012 MT 156, ¶ 31, 365 Mont. 405, 282 P.3d 687, the fact-finder is uniquely in the best position to judge the credibility of witnesses, *State v. Simpson*, 2014 MT 175, ¶ 18, 375 Mont. 393, 328 P.3d 1144. We accordingly defer to the trial court regarding the credibility of witnesses and the weight to be accorded their testimony. *Ditton v. DOJ Motor Vehicle Div.*, 2014 MT 54, ¶ 33, 374 Mont. 122, 319 P.3d 1268 (citation omitted). Here, the District Court was in the best position to assess the credibility of the competing expert reports and their testimony. The District Court provided a basis for accepting Dr. Newman's testimony over that of Dr. Hill, as well.

¶34 Furthermore, Barrus, in his own word and as observed by the District Court, made clear his awareness of each stage of events of May 17, 2017. The District Court noted that the evidence supported that Barrus recognized his participation in the extended pursuit, beginning with passing Deputy Moore above the speed limit while intoxicated, and the spectrum of legal consequences for Marshall had law enforcement apprehended him. As

17

the driver of the Suburban, Barrus returned to Deputy Moore's stopped vehicle to allow Marshall to eliminate Deputy Moore as a witness so that his son was not charged with attempted murder—a rationale that suggests a recognition of legal consequences, strategic reasoning, and an understanding of the gravity of their actions. Barrus coordinated evasive driving and later assisted Marshall's rifle fire in responding to law enforcement by maintaining stable control of the Suburban despite driving on its rims, thereby enabling the vehicle to continue to evade apprehension. A trier of fact could conclude Barrus's conduct was purposeful behavior aimed at avoiding apprehension. Upon his surrender to law enforcement, Barrus remained cogent and articulated the preceding events and his participation in them, including an expressed awareness that he had transgressed the laws of Montana and that the State would inevitably prosecute him for his actions.

¶35    The District Court's findings are supported by substantial evidence and comport with the plain meaning of both the "appreciate the criminality" or "conform . . . behavior to the requirements of the law" prongs of § 46-14-311(1), MCA. *See* § 1-2-101, MCA ("In the construction of a statute, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein. . . . Where there are several provisions or particulars, such a construction, if possible, to be adopted as will give effect to all."); § 1-2-106, MCA ("Words and phrases used in the statutes of Montana are construed according to their context and the approved usage of the language[.]"); *State v. Levine*, 2024 MT 169, ¶ 15, 417 Mont. 410, 553 P.3d 416 (The court must look first "to the plain meaning of words in statutes."). In *Korell*, this Court vacated and remanded a commitment

18

to DOC when the trial court refused to independently evaluate the defendant as required by § 46-14-311, MCA. *Korell*, 213 Mont. at 338-39, 690 P.2d at 1004. There, the sentencing judge conflated the mental state element of the crime found by the jury in their verdict, with the § 46-14-311, MCA, requirement that the court independently consider whether the defendant was unable to appreciate the criminality of his behavior or to conform his behavior to the requirements of the law. *Korell*, 213 Mont. at 338-39, 690 P.2d at 1004. We determined that this "refusal to act" by the trial court "fl[ew] in the face of the court's basic duty to evaluate the defendant's mental health condition." *Korell*, 213 Mont. at 338, 690 P.2d at 1004. We explained, "[t]he fact that a jury has found the existence of a requisite mental state does not conclusively establish the defendant's sanity or fitness for penal punishment[,]" which must be instead determined by the sentencing judge and memorialized, so the deliberative process of the court is apparent. *Korell*, 213 Mont. at 338-39, 690 P.2d at 1004.

¶36 Here, the District Court noted similarities between § 45-2-101(35), MCA, "knowingly" and § 46-14-311, MCA, "appreciating the criminality" in summarizing Dr. Newman's testimony without explicitly equating the two concepts, citing our holding in *State v. Tibbitts*, 226 Mont. 36, 733 P.2d 1288 (1987). In *Tibbitts*, this Court affirmed a commitment to DOC custody when the district court based its conclusion on, among other things, the defendant's ability to express what was going on around him to police officers following the incident, his ability to recall in a "calm and understanding manner" the events leading up to the criminal activity, and testimony from an examining psychiatrist that the

19

defendant "fit within the 'knowingly' definition" of § 45-2-101(35), MCA. *Tibbitts*, 226 Mont. at 41-42, 733 P.2d at 1292. Unlike *Korell*, where the district court simply adopted the jury's finding that the defendant acted "knowingly" without conducting its own examination of evidence of the defendant's mental disorder required by § 46-14-311, MCA, *Korell*, 213 Mont. at 338-39, 690 P.2d at 1004, the *Tibbitts* court independently scrutinized the full record, including the testimony of the examining psychiatrist who analogized "appreciate" to "knowingly." *Tibbitts*, 226 Mont. at 41-42, 733 P.2d at 1292.

¶37 Likewise, the District Court here engaged in the independent evaluation of the evidence required by § 46-14-311, MCA, and did not substitute the jury's findings regarding mental state, concluding Barrus appreciated the criminality of his behavior and could conform his behavior to the law. The relevant inquiry here is whether the District Court's conclusion was supported by the record. *Coburn*, ¶ 19; *Spell*, ¶ 34; *Gallmeier*, ¶ 20; *Collier*, 277 Mont. at 59, 919 P.2d at 384. Having determined the District Court complied with the requirements of § 46-14-311, MCA, and substantial evidence in the record supports its conclusion to sentence Barrus to DOC custody, we disagree with Barrus's argument the court relied on an erroneous interpretation of "appreciate."

## CONCLUSION

¶38 We conclude that the District Court did not abuse its discretion in sentencing Barrus to DOC custody. The record establishes that the District Court thoroughly considered the evidence before it and the record reflects its independent deliberation on the merits of Barrus's case. *Coburn*, ¶ 24. This Court will not disturb a district court's conclusion

regarding a defendant's mental disease or disorder unless the conclusion is unsupported by the record. *Coburn*, ¶ 19; *Gallmeier*, ¶ 20. Our review of the record supports a finding that Barrus appreciated the criminality of his behavior or could have conformed his conduct to the law. Barrus has not met his burden of proof under § 46-14-311, MCA. Accordingly, we affirm the District Court's judgment sentencing Barrus to the custody of DOC instead of DPHHS.

¶39 Affirmed.

/S/ LAURIE McKINNON

We Concur:

/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA
/S/ KATHERINE M BIDEGARAY
/S/ INGRID GUSTAFSON

Chief Justice Cory Swanson recused himself and did not participate in this matter.


Justice Katherine Bidegaray, concurring.

¶40 I concur in the Court's judgment affirming the district court's sentencing order. I write separately to emphasize the statutory meaning of "appreciate the criminality" in § 46-14-311, MCA, and to caution against interpretations that would collapse this post-conviction inquiry into a trial-stage mens rea determination. While I believe the outcome is sustainable on this record, I underscore the importance of preserving the statutory distinction between *knowing* and *appreciating* the criminality of one's behavior, particularly in cases involving long-standing mental illness.

21

## I.  The Legal Standard: "Appreciate" Means More Than "Know"

¶41    Section 46-14-311, MCA, requires a sentencing court to determine whether, at the time of the offense, the defendant was suffering from a mental disease or defect that rendered them "unable to appreciate the criminality of [their] behavior or to conform [their] behavior to the requirements of law."  This language establishes a post-conviction inquiry distinct from the question of mens rea at trial.  Because the defendant has already been found guilty beyond a reasonable doubt, the § 46-14-311, MCA, analysis presumes that the defendant acted "knowingly" or "purposely" within the meaning of § 45-2-101(35), (65), MCA, but allows consideration of whether mental illness nonetheless deprived the defendant of the capacity to fully grasp the legal and societal implications of their actions.

## II.    "Appreciate" Means More than "Know"

¶42    To interpret "appreciate the criminality" as synonymous with "know the act was illegal" would collapse this post-conviction standard into the mens rea analysis and render § 46-14-311, MCA, a nullity.  The ordinary meaning of "appreciate"—to understand fully or recognize the significance of—encompasses more than mere factual awareness.[1]  It requires the court to consider whether the defendant, due to mental illness, was incapable of grasping the legal, moral, and societal implications of their actions at the time of the offense.  Legislative history confirms this broader meaning: in amending HB 877 to include what is now § 46-14-311, MCA, Senator Towe explained it was for cases where a person

---

[1] *See Appreciate*, *Merriam-Webster's Collegiate Dictionary* 66 (11th ed. 2003) (defining "appreciate" as "to grasp the nature, worth, quality, or significance of" and "to understand fully"); Bryan A. Garner, *Garner's Dictionary of Legal Usage* 71, 236 (3d ed. 2011) (defining "appreciate" as "to recognize the significance of").

"thought what he did was not criminal," even though he intended the act.[2]  This history reinforces that "appreciate" must be read in tandem with "criminality" and "behavior," giving effect to each word under ordinary-meaning and context canons.

### III.  The District Court's Treatment of Expert Testimony

¶43    The District Court's order does not expressly adopt Dr. Newman's framing of "appreciate" as equivalent to "know," but its reliance on his conclusions warrants caution. Dr. Newman testified, for example, that "appreciate" meant whether the person was aware they were breaking the law of the State, and that he assessed "criminality" by looking for indications that the defendant "knew the act was illegal."[3]  That is not the standard the statute contemplates.  To the extent future courts are asked to assess mental condition under § 46-14-311, MCA, they must evaluate appreciation as a deeper cognitive and emotional understanding, not simply recognition of legal consequence.

¶44    I emphasize that my concurrence should not be read as endorsing the legal framework advanced by Dr. Newman.  It is only because the District Court did not itself articulate the flawed definition—and because the record contains sufficient evidence to

---

[2] The Montana Legislature enacted § 46-14-311, MCA, as part of a broader reform in 1979 that abolished the traditional insanity defense while preserving a narrow post-conviction inquiry into a defendant's mental condition at the time of the offense.  During legislative hearings, Senator Towe explained that the provision was intended to reach defendants who "did something wrong [and] intended to do it, but . . . thought what [they] did was not criminal." *Sen. Jud. Comm. Hr'g Minutes* (Mar. 19, 1979).  This reflects the Legislature's intent to distinguish "appreciation" from mere awareness of conduct and to require courts to assess whether a mental disease or defect impaired a defendant's ability to fully comprehend the criminality of their actions. *See also State v. Korell*, 213 Mont. 316, 338-39, 690 P.2d 992, 1004 (1984) (sentencing courts must "independently evaluate the defendant's mental condition" and "set forth [a] deliberative process").

[3] Trial Tr. 52:21-23, January 24, 2022 ("does the person have awareness that they're breaking the law of the State?"); Trial Tr. at 54, 79, January 24, 2022.

support the outcome under a correct understanding of "appreciate"—that I concur in the result.

## IV. Evidence Sufficient Under the Correct Standard

¶45 The evidence in this case presents a close question, but I conclude that a factfinder could reasonably determine that Barrus, despite his delusional disorder, retained the ability to appreciate the criminality of his conduct at the time of the offense. Notably, the record reflects that:

- Barrus turned the vehicle around at his son's request, reportedly because Marshall did not want to be charged with attempted murder—a rationale that suggests a recognition of legal consequences, strategic reasoning, and an understanding of the gravity of their actions;

- Barrus coordinated evasive driving and engaged in an armed confrontation with law enforcement, conduct from which a trier of fact could infer purposeful behavior aimed at avoiding apprehension; and

- Even Dr. Hill acknowledged that Barrus repeatedly offered this same legal-motivated explanation for returning to the scene, both before and after treatment.

¶46 While § 46-14-311, MCA, directs courts to focus on the defendant's condition "at the time of the commission of the offense," post-arrest statements may corroborate contemporaneous behavior. Here, the totality of the record permitted the District Court to conclude that Barrus's appreciation of the criminality of his conduct was not vitiated by his delusional disorder.

## V. Conclusion

¶47 Because the District Court's finding is supportable under the correct legal standard, I concur in the Court's judgment. However, I respectfully caution that future applications

of § 46-14-311, MCA, must give full effect to the Legislature's use of the term "appreciate"—a term that demands more than mere knowledge. The purpose of the statute is to account for the diminished capacity of individuals who, although legally culpable, lacked the mental and emotional faculties to fully grasp the criminality of their behavior. That statutory distinction must be preserved.

/S/ KATHERINE M BIDEGARAY